# EXHIBIT C

1

2 **UNITED STATES DISTRICT COURT**

3 **SOUTHERN DISTRICT OF CALIFORNIA**

4

5 LUCENT TECHNOLOGIES INC.,

6       Plaintiff and Counterclaim-defendant,

7 v.

8 GATEWAY, INC. and GATEWAY
COUNTRY STORES LLC, GATEWAY
COMPANIES, INC., GATEWAY
9 MANUFACTURING LLC and
COWABUNGA ENTERPRISES, INC.,

10       Defendants and Counter-claimants,

11

12 and

MICROSOFT CORPORATION,
13

14       Intervenor and Counter-claimant,

15 _____

16 MICROSOFT CORPORATION,

      Plaintiff and Counterclaim-defendant,
17

18 v.

19 LUCENT TECHNOLOGIES INC.,

20       Defendant and Counter-claimant

21 _____

22 LUCENT TECHNOLOGIES INC.,

23       Plaintiff,

24 v.

25 DELL, INC.,

26       Defendant.

27 _____

28

**Civil No:** 02CV2060-B(CAB)
consolidated with
**Civil No:** 03CV0699-B (CAB) and
**Civil No:** 03CV1108-B (CAB)

**ORDER ON MICROSOFT'S MOTIONS
FOR JUDGMENT AS A MATTER OF
LAW AND NEW TRIAL AND
LUCENT'S MOTION TO ALTER OR
AMEND THE JUDGMENT
REGARDING U.S. PATENT NOS.
5,341,457 AND RE 39,080**

02CV2060-B (CAB)

1  **I.      INTRODUCTION**

2       On January 29, 2007, a jury trial commenced in case no. 02cv2060 on issues

3  pertaining to audio coding patents U.S. Patent Nos. 5,341,457 and RE 39,080 ("the '457

4  patent" and "the '080 patent," respectively).  On February 22, 2007, the jury returned a

5  verdict in favor of Plaintiff Lucent Technologies, Inc. ("Lucent") finding the patents valid

6  and infringed by Defendant Microsoft Corporation ("Microsoft").

7       Following the trial, the Court also ruled on the non-jury issues of standing and

8  Microsoft's license defense.  These rulings were based on the jury's finding that the work

9  incorporated into U.S. Patent No. 5,627,938 ("the '938 patent"), the patent on which the

10  reissue '080 patent is based, was not performed on or after April 1989.  The Court held that

11  the '080 reissue patent is not co-owned by Fraunhofer; Lucent is sole owner of the '080

12  patent and has standing to sue for infringement.  The Court also ruled that the Fraunhofer-

13  Microsoft Agreement did not confer a license to Microsoft to practice the '080 patent.

14       Microsoft now moves the Court for judgment as a matter of law under Fed. R. Civ.

15  P. 50(b) on the following issues: (1) no infringement of the '457 patent; (2) no infringement

16  the '080 patent; (3) the '080 patent is not "existing work" under the AT&T-Fraunhofer

17  Agreement; (4) invalidity; and (5) damages.  In addition, Microsoft moves the Court to

18  amend its judgment under Fed. R. Civ. P. 52(b) regarding Lucent's standing and

19  Microsoft's license defense.  Microsoft also moves for a new trial on related issues

20  including: (1) infringement; (2) the categorization of the '080 patent as "Existing

21  Work";(3) invalidity; and (4) damages.

22  **II.     STANDARD OF LAW**

23       **A.     Judgment as a Matter of Law**

24       A motion for judgment as a matter of law must be denied, and a jury verdict upheld,

25  if the judgment is supported by substantial evidence.  <u>Johnson v. Paradise Valley Unified</u>

26  <u>School District</u>, 251 F.3d 1222, 1227 (9th Cir. 2001).  Substantial evidence is evidence

27  adequate to support the jury's conclusion, even if it is possible to draw a contrary

28                                                  2

1  conclusion from the same evidence." Id.  The Court must review the record as a whole but

2  disregard all evidence favorable to the moving party that the jury is not required to believe.

3  Id.  All reasonable inferences must be drawn in the light most favorable to the nonmoving

4  party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986).

5  **B.     New Trial**

6       The power of the court to grant a new trial under Fed. R Civ. P. 59(a) is "confided

7  almost entirely to the exercise of discretion on the part of the trial court." Murphy v. City of

8  Long Beach, 914 F.2d 183, 186 (9th Cir. 1990) (quoting Allied Chem. Corp. v. Daiflon,

9  Inc., 449 U.S. 33, 36 (1980)).  Unlike a motion for judgment as a matter of law, "[t]he

10  judge can weigh the evidence and assess the credibility of witnesses, and need not view the

11  evidence from the perspective most favorable to the prevailing party."  Landes Const. Co.,

12  Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371 (9th Cir. 1987); Molski v. M.J. Cable,

13  Inc., 481 F.3d 724, 729 (9th Cir. 2007) ("the district court has the duty to weigh the

14  evidence as the court") (internal quotations omitted).  The district court should "set aside

15  the verdict of the jury, even though supported by substantial evidence, where, in the court's

16  conscientious opinion, the verdict is contrary to the clear weight of the evidence." Molski,

17  481 F.3d at 729.; see also Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d

18  814, 819 (9th Cir. 2001) ("a trial court may grant a new trial if the verdict is contrary to the

19  clear weight of the evidence . . . or to prevent, in the sound discretion of the trial court, a

20  miscarriage of justice").  In general, a court should grant a new trial only when it "is left

21  with the definite and firm conviction that a mistake has been committed." Landes Constr.,

22  833 F.2d at 1372. "[A] district court may not grant a new trial simply because it would have

23  arrived at a different verdict."  Silver Sage Partners, 251 F.3d at 819.

24  **III.     OWNERSHIP AND LICENSE OF THE '080 PATENT**

25       Among the affirmative defenses raised by Microsoft, two related to the ownership of

26  the '080 patent.  Microsoft asserted that the '080 patent was co-owned by Fraunhofer

27  Gesellschaft ("Fraunhofer"), a German research company.  As such, Microsoft contended

28                                             3

1   that Lucent lacked standing to bring suit against Microsoft for infringement of the '080

2   patent.   Microsoft also asserted the defense of license, contending that it had a license from

3   Fraunhofer to practice the '080 patent. These affirmative defenses were addressed in two

4   parts at trial.  The jury heard evidence on the factual question of whether any work

5   performed during the period of collaboration between AT&T and Fraunhofer had been

6   incorporated into any of the claims of U.S. Patent No. 5,627,938 ("the '938 patent") which

7   then was reissued as the '080 patent. The Special Verdict Form included a "Special

8   Question" on this issue: "Has Microsoft proven by a preponderance of the evidence that

9   work was performed on or after April 1989 which was incorporated into any of the claims

10   of the '938 patent?  Please answer yes or no."  The jury answered "no."  Based then on the

11   jury's factual finding, the Court ruled that under the 1989 research agreement between

12   AT&T and Fraunhofer ("the JDA"), Fraunhofer was not a co-owner of the '938 patent or

13   the '080 reissue patent.  Therefore, Lucent had standing to sue and the defense of license

14   was not available to Microsoft.  Microsoft now challenges the jury's findings and the

15   Court's subsequent rulings on a number of grounds.

16       **A.**      **Exclusion of Deposition Testimony from Mr. Restaino and Mr. Devilliers**

17       At trial on February 12, Microsoft attempted to play two video-taped depositions

18   before the jury to which Lucent objected. (Trial Tr. vol. X, 17:6-24:7, Feb. 12, 2007.)  The

19   first was the deposition of Mr. Restaino from AT&T and the other was the deposition of

20   Mr. DeVilliers from Creative Labs. Mr. Restaino was to testify about AT&T's view of the

21   rights under the JDA. (Id. at 18:4-18.)  The Court ruled that AT&T's opinions of Lucent's

22   duties under the agreement were not relevant. (Id. at 19:16-24.)  Mr. DeVilliers was to

23   testify about Lucent 's reticence in its negotiations with Creative Labs to discuss Lucent's

24   rights under the JDA. (Id. at 20: 8-16, 21:18-25.)  The Court ruled that this latter testimony

25   was collateral, lacking relevance and confusing to the jury. (Id. at 23:2-6.)

26       Microsoft now argues that the exclusion of these depositions was in error because

27   the jury was entitled to hear how AT&T and Lucent viewed the JDA. The Court, however,

28                                               4

finds no error or prejudice in the exclusions.  First, Microsoft incorrectly asserts that the Court's reason for the exclusion of the testimony was because it was deemed "not credible" and that credibility should have been a question for the jury.  This is belied by the record; the Court excluded the testimony as not relevant and/or prejudicial.  Microsoft confuses "credibility" with "admissibility."  Admissibility is a question for the court, not the jury.  Fed. R. Evid. 104.  Additionally, Microsoft has not pointed to any jury issue on which this evidence would have been relevant.  The interpretation of the JDA was a question left to the Court, not the jury.  Therefore, the Court **DENIES** Microsoft's motion for a new trial on this ground.

### B.    New Work Versus Existing Technology Under the JDA

The JDA between Fraunhofer and AT&T covered collaborative work during the period of the stay of Karlheinz Brandenburg at AT&T.  (DX 6489 at 2.)  This period began in April 1989 and ended in June 1990.  (Trial Tr. vol. VI, 192:15-17, Feb. 5, 2007.)  All work done on digital audio coding during this period was classified as "New Work" and would be jointly owned by AT&T and Fraunhofer.  (DX 6489 at 2, 3 § 1.)  In 1991, the period covering New Work was extended by AT&T and Fraunhofer to cover work that continued after the expiration of the JDA and the departure of Brandenburg.  ("the extension letter," DX5616.)  The parties agreed to extend the period indefinitely, until one of the parties gave notice to terminate the arrangement.  (Id.)  No evidence was presented that the parties ever terminated the agreement.  Hence, the combined effect of the JDA and the extension letter defines the period of New Work as beginning in April 1989 at the arrival of Brandenburg and continuing indefinitely thereafter.

In the instant trial, Lucent and Microsoft agreed to present the factual question of New Work to the jury by asking whether or not work performed on or after April 1989 was incorporated into any of the claims of the '938 patent.  (Special Verdict Form; Tr. Chambers Feb. 7, 2007, 173:12-24; Trial Tr. vol. XII, 90:7-22, Feb. 14, 2007.)  Microsoft's prima facie case relied on the description of the work in the '938 patent specification.  The '938

1     patent was applied for on September 22, 1994 and claimed priority as a continuation of

2     application serial no. 844,811 to March 2, 1992. This dated the work described and

3     claimed therein to 1992. Lucent argued that the claims of the '938 patent were described in

4     the '457 patent specification filed in 1988; this placed the date of this work before the April

5     1989 dividing line in the JDA.[1] Lucent also presented testimony of Mr. Johnston, the

6     inventor of the '938 patent, on work he had performed on or around 1988.

7        Microsoft now contends that there was insufficient evidence on which the jury could

8     have found that the work encompassed in claims 2 and 4 of the '938 patent was not

9     performed on or after April 1989.

10          **1.    Claim 2**

11        Claim 2 is a dependent claim which includes the method of claim 1 and adds the

12     limitation "wherein the set of frequency coefficients are MDCT coefficients." Microsoft

13     contends that MDCT (modified discrete cosine transform) coefficients are nowhere

14     mentioned in the '457 patent and thus this patent and its date of filing cannot provide

15     evidence that the work embodied in claim 2 was performed before April 1989.

16        Regarding the disclosure of the claimed method using an MDCT, Lucent argues that

17     sufficient evidence was presented on this point in the form of testimony of witnesses and

18     statements in the '938 patent specification showing that MDCT coefficients were well

19     known in the art. It contends that because the '457 patent describes time to frequency

20     transforms and an MDCT is a type of such transform, one of ordinary skill in the art would

21     understand the '457 to include the method set forth in claim 2 of the '938 patent.

22        This contention is problematic. First, as a matter of law, claim 2 cannot claim

23

24       [1] The '080 patent claims priority as a continuation-in-part (CIP) to an application filed in February 1992 which was a continuation of an application filed in December 1988. This latter 1988

25     application issued as the '457 patent. Claims in a CIP application may have different priority dates, but only those supported by the parent application are entitled to the earlier filing date. <u>Waldemar</u>

26     <u>Link v. Osteonics Corp.</u>, 32 F.3d 556, 558-59 (Fed. Cir. 1994) (noting that the priority date for each claim is not memorialized by the patent office; when a dispute arises the Court must determine the

27     proper date for each claim at issue).

28                               6

1  priority to the '457 patent based on the evidence presented at trial. The '457 specification

2  does not mention MDCTs. Dr. Jayant's testimony stated only that MDCTs were known at

3  the time of the '457 patent. (Trial Tr. vol. XI, 101:4-11, Feb. 13, 2007.) He also testified

4  that one of ordinary skill in the art would have recognized that the claimed methods could

5  have been implemented with an MDCT and would have been able to do so without undue

6  specification. (Id. at 101:12-24.) This testimony does not demonstrate that the method of

7  claim 2 was sufficiently described in the '457 patent. "A description which renders obvious

8  the invention for which an earlier filing date is sought is not sufficient." Lockwood v.

9  American Airlines, Inc., 107 F.3d 1565, 1572 (Fed. Cir. 1997). A demonstration of

10  obviousness is not sufficient to show the inventor "possessed" the invention. Id.

11      Second, simply because one of skill in the art may have been able to implement

12  claim 2 from the '457 patent specification and the knowledge in the art as to MDCTs, does

13  not lead to the conclusion that the inventor of the '938 patent, Johnston, performed such

14  work as of the filing date of the '457 patent. On this topic, Johnston testified that he did

15  not perform this work before the collaborative period of the AT&T-Fraunhofer agreement

16  began:

17      Q    Who taught you about an MDCT?
        A    Well, I hadn't heard of it until I saw Karlheinz's
18      paper, and then I had sort of looked at it before Karlheinz
        came, but when Karlheinz came and sat down and explained it,
19      that was when I really learned about it. It was the first
        time I actually got my hands on it practically.
20      Q    In other words, in 1989?
        A    Yeah.
21      Q    Okay. And did you have any understanding from Doctor
        Karlheinz -- Doctor Brandenburg at the time you did the work
22      on the 457 patent?
        A    No. I hadn't heard of the MDCT at all. Apparently the
23      publication was out, but I hadn't spotted it.

24  (Trial Tr. vol. VI, 36:13-25, Feb 5, 2007.) Although Lucent argues that the jury could have

25  disregarded this testimony, there was no other evidence of record that the work was

26  performed prior to April 1989. The only other evidence of the work encompassed by claim

27

28                                          7

2 was the '938 specification itself, with a date of 1992.[2]  Therefore, the jury's finding that claim 2 was not performed on or after April 1989 is not supported by sufficient evidence; the Court therefore **GRANTS** judgment as a matter of law on this ground.  Additionally, because the jury's verdict was against the clear weight of the evidence, in the alternative, the Court **GRANTS** a new trial on this issue.

### 2.    Claim 4

In the Markman hearing preceding trial, the Court construed the means for receiving and the means for converting as set forth in claim 4 to require the same corresponding structure:

> Structure: (as described in the ['938] specification at Col. 23:59 - Col. 24:1)[3], a digital signal processor (DSP), a DSP with software, VLSI hardware embodiments, or hybrid DSP/VLSI embodiments.

These corresponding structures (DSP and VLS1) do not appear in the '457 specification; they appear for the first time in the '938 patent specification filed in 1992.  At trial, however, Lucent's expert Dr. Jayant testified in a conclusory fashion that this corresponding structure was disclosed in the '457 specification.  (Trial Tr. vol. XI, 110:12-18, Feb. 13, 2007.)  He did not, however, indicate where these structures could be found in the '457 specification.  Instead, Jayant's testimony took two paths - both insufficient as a matter of law to demonstrate that the written description in the '457 patent could provide a 1988 priority date for claim 4.

First, Jayant testified that the two "means" could be found in Figure 7 of the '457 patent, labeled as boxes 72 and 76.  He indicated that box 76 was where the bitstream came

---

[2] Lucent's argument that the reference in Figure 2 of the '080 patent to MDCTs as prior art with a reference to a publication dated 1987 does not change this analysis.  This reference does not indicate one way or the other whether Johnston performed or even conceived of his method using MDCTs before April 1989.  The specification of the '080 patent is based on applications filed in 1992 and 1994.  At most, it suggests that on or around 1992 or 1994, Johnston knew of MDCTs and had considered their use in his claimed method.

[3] The reference to the '938 specification corresponds to Col. 24:18-24 in the '080 reissue specification.

1   into the decoder and was unpacked; box 72 transformed frequency information into a time

2   wave form. (Id. at 109:5-15, 110:1-11.)  He did not identify these boxes as "structures."

3   Figure 7 of the '457 patent identifies only function and does not describe any structures that

4   carry out these functions.  Moreover, even if boxes 72 and 76 could themselves arguably

5   represent a structure, Lucent did not present any evidence through Jayant or any other

6   witnesses to show that such structure was the same or equivalent to the corresponding

7   structure for claim 4 as construed by the Court.

8         Second, Jayant's testimony that one of skill in the art would know that the

9   DSP/VLS1 structures could be used for implementing the means for receiving and

10  converting functions (id. at 110:19-111:6) also is insufficient.  "[S]tructure supporting a

11  means-plus-function claim under § 112, ¶ 6 must appear in the specification . . . [the]

12  consideration of the understanding of one skilled in the art in no way relieves the patentee

13  of adequately disclosing sufficient structure in the specification.  Medical Instrumentation

14  and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1212 (Fed. Cir. 2003); Biomedino,

15  LLC v. Waters Technologies Corp., - - F.3d - -, 2007 WL 1732121, *5 (Fed. Cir. June 18,

16  2007).

17        Dr. Jayant's legally unsupportable opinions cannot support the jury's verdict.  See

18  Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993)

19  ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of

20  the law, or when indisputable record facts contradict or otherwise render the opinion

21  unreasonable, it cannot support a jury's verdict.");  Tronzo v. Biomet, Inc.,156 F.3d 1154,

22  1159 (Fed. Cir.1998) (expert testimony that was either contradicted by the patent

23  specification itself and/or incorrect based on the applicable law was insufficient to support

24  the jury's verdict on written description and priority date).

25        As with claim 2, the disclosure of the '938 patent establishes a prima facie case that

26  the corresponding structure for claim 4 was first described therein and thus entitled to a

27  date no earlier than 1992.  Having excluded Dr. Jayant's testimony on claim 4, there is no

28                                              9

other evidence that rebuts this prima facie showing. The only other evidence relied on by Lucent, the inventor Mr. Johnston's testimony, does not indicate that the work incorporated in claim 4 was performed prior to April 1989. Johnston testified that he constructed his perceptual transform (PXFM) decoder software by April 2, 1987 (Trial Tr. vol. VI, 97:5-11, Feb. 5, 2007.) Johnston testified only that his constructed PXFM performed the functionality related to the decoder described in the '457 patent; he did not testify as to whether his constructed decoder had the DSP and/or VLS1 corresponding structures. Lucent's argument that several experts testified as to the existence of DSPs before April 1989 is of no avail, nor is the evidence that Johnston may have known about DSPs in some general context (but not in the context of his invention). The question is not whether the inventor *could* have constructed the decoder with the corresponding structure but whether he did.

Because the only evidence of work involving the decoder constructed with the DSP and/or VLSI corresponding structure appeared in the '938 specification as filed September 22, 1994 (priority date March 2, 1992), there was insufficient evidence to support the jury's verdict that claim 4 was performed before April 1989. Therefore, Microsoft's motion for judgment as a matter of law on this issue is **GRANTED**. Additionally, because the jury's verdict was against the clear weight of the evidence, in the alternative, the Court **GRANTS** a new trial on this issue.

### C.     Ownership of the '080 Patent

Having determined that claims 2 and 4 were performed on or after April 1989, under the JDA, these claims constitute "New Work." The question then turns to the ownership rights of this work as it stands incorporated into the '938 and '080 patents. The JDA contains the following relevant provisions on ownership of New Work:

> All New Work is treated as joint work. The intellectual property rights to that work will be jointly owned by AT&T and FhG. Each party has the nonexclusive right to make use of the results of New Work (including intellectual property rights), and may grant nonexclusive licenses to others to use the results of such New Work.

10

(DX 6489 at 3 § 1.)

> The parties will consult with each other regarding the filing of patent applications on New Work including New Work reflected in the above-mentioned transmittals and papers proposed for publication. Each party will have the first opportunity to file patent applications for New Work done primarily by its employees, but if a party declines the opportunity to file any such patent application, or after filing any patent application chooses not to proceed further in attempting to secure a patent, the other party may elect to do so. Each party will ensure that its employees, and others cooperating with it in New Work cooperate with the other party in filing all patent applications.

(Id. at 3 § 2.) Based on these passages and the context of the agreement, the JDA evidences an intent to share ownership of New Work, including work on which patent applications would be filed.

The '938 and '080 patents encompassing the jointly owned New Work also contains two additional claims (claims 1 and 3) that are not New Work.[4] These claims are classified as "Existing Technology" under the JDA, defined as Digital Audio Coding Work before the beginning of the period of Brandenburg's stay at AT&T (before April 1989) as described in Attachments A and B to the JDA. (Id. at 2.) The JDA addresses Existing Technology under licensing provisions:

> Existing AT&T Technology and Existing FhG Technology, including related patents and patent applications will be available under license to the other party, subject to the terms of a perpetual nonexclusive. royalty-free license between AT&T and FhG.

(Id. at 3 § 3.) The JDA also envisioned that Fraunhofer would have rights to sublicense AT&T's Existing Technology to third parties only under defined circumstances.[5] (Id. at 3 §§ 5, 6.)

The JDA does not contain any explicit provisions for newly filed patents and/or

---

[4] The '938 patent contains claims 1-4. The '080 patent contains claims 1, 3 and 4; Lucent removed claim 2 from the '080 patent during prosecution of the reissue application. At trial, Microsoft did not show that claims 1 and 3 were not entitled to the earliest priority date of the '080 patent (1988). The evidence indicated that these claims were performed by Johnston prior to the collaboration with Fraunhofer and could claim priority to the '457 patent. The '457 patent was defined as Existing Technology under the JDA. (Id. at 2, Attachment A.)

[5] These circumstances have previously been determined not to apply to the Fraunhofer-Microsoft agreements covering the technology at issue here.

11

1  patent applications that contain both New Work and Existing Technology. Under <u>Pope</u>

2  <u>Mfg. Co. v. Gormully & Jeffery Mfg. Co.</u>, 144 U.S. 248, 252 (1892), a patentee can not

3  split up ownership of an existing patent by assigning separate claims to different parties.

4  Hence, the JDA cannot readily be interpreted to split the '938 and/or '080 patents into

5  "New Work" (claims 2 and 4) owned by both AT&T and Fraunhofer and "Existing

6  Technology" (claims 1 and 3) owned solely by AT&T, without coming into conflict with

7  <u>Pope</u>.

8      Lucent argues that the JDA should be interpreted to provide full ownership of the

9  '938 and '080 patents to AT&T and give only licensing rights on the New Work to

10  Fraunhofer. It argues that the sentence dictating "joint ownership" over New Work does

11  not give Fraunhofer true ownership rights because the subsequent sentence provides

12  Fraunhofer only with the right to use the New Work, not make it or sell it. (<u>See</u> DX 6489

13  at 3 § 1.) This position is unpersuasive. The JDA does not divide the rights to make, use

14  and sell between the parties. It only provides the rights "to make use" to both parties.

15  Interpreting this phrase as only the right to use would suggest that neither party could make

16  or sell technology encompassing the New Work, a result that is nonsensical. Additionally,

17  the JDA states that the parties may "make use of" intellectual property rights to the New

18  Work and that the parties envisioned that rights to New Work would be memorialized in

19  patent applications filed on the New Work. (<u>Id.</u> at 3 §§ 1, 2.) Intellectual property rights

20  (<i>e.g.</i>, patent ownership) on New Work would include rights to make, use and sell. There is

21  nothing to suggest that the JDA did not intend for these intellectual property rights of

22  making, using and selling the New Work to flow to both parties.

23      The circumstances here have many parallels with those of <u>Israel Bio-Engineering</u>

24  <u>Project v. Amgen, Inc.</u>, 475 F.3d 1256, 1263-64 (Fed. Cir. 2007). In that case, two parties

25  executed a series of agreements regarding a joint research and development project which

26  provided ownership of work performed during the joint project to one party and all work

27  done subsequent to the joint project to the other. <u>Id.</u> at 1259-1260. A patent was filed

28                                    12

1    containing three claims: one claim encompassed work done as part of the joint project; the

2    other two claims encompassed later work. Id. at 1261. Since ownership attaches to the

3    patent as a whole, the Court found that neither party could have sole ownership of the

4    patent. Id. at 1267-68. Instead, the two parties each had undivided co-ownership interest.[6]

5    Id. at 1268. Furthermore, the Court refused the suggestion that because one party had filed

6    all the claims together, that party forfeited all ownership rights to the joint work

7    incorporated therein. Instead, the only thing forfeited was either parties' right to

8    exclusivity to any of the work encompassed in the claims of the patent. Id. at 1267.

9            Similarly here, by filing claims to New Work in the same application as claims to

10    Existing Technology, the patent is jointly owned by AT&T and Fraunhofer. AT&T cannot

11    cause Fraunhofer to forfeit its ownership rights to New Work simply by filing AT&T's

12    Existing Technology in the same patent application. If anything is forfeited, it is AT&T's

13    rights to exclusive ownership of the entire '938 patent. AT&T forfeited that right when it

14    chose to file all four claims in one application. Lucent made a similar decision when it

15    applied for the reissue that became the '080 patent and chose to keep claim four in the same

16    application with claims one and three, all with one priority claim. The Court therefore

17    **FINDS** that under the JDA, the '938 patent and its reissue, the '080 patent, are jointly

18    owned by AT&T and Fraunhofer.

19        **D.    Lucent's Standing**

20            "An action for infringement must join as plaintiffs all co-owners." Ethicon, Inc. v.

21    U.S. Surgical Corp., 135 F.3d 1456, 1467 (Fed. Cir. 1998). Since Fraunhofer is a co-owner

22    of the '080 patent and it is not joined in the instant suit, Lucent lacks standing to sue

23

24        [6]    Although the situation in Israel also concerned joint inventors, that difference does not
render the comparison to the instant circumstances inapplicable. Here, the situation created by the
25    filing of New Work and Existing Work into a single patent is much like the filing of a patent with
more than one inventor, where all the inventors did not contribute to each and every claim. Even
26    though Johnston is a single inventor, there are two "personas": Johnston with AT&T as the sole owner
of his Existing Technology and Johnston with joint owners AT&T and Fraunhofer to his New Work.
27    The filing of an application with these two "personas" renders the same result as filing with multiple
inventors - each assignee is a joint owner of the whole patent.

28                                                    13

1 Microsoft for infringement on this patent.  The Court therefore **DISMISSES** under Fed. R.

2 Civ. P. 12(b)(1) Lucent's claims on the '080 patent in their entirety and **AMENDS** its Rule

3 52(b) judgment accordingly.

4       Although Lucent could potentially amend its complaint to join all co-owners in the

5 suit and establish standing, as discussed below, it appears from the record that Fraunhofer

6 has granted a license to Microsoft.  Absent any challenge of this license, even if Lucent

7 could establish standing, Microsoft would not be liable to Lucent or any other co-owner of

8 the '080 patent.

9      **E.**    **Microsoft's License Defense**

10       In 1997, Microsoft entered into a software agreement with Fraunhofer.  (PX34.)

11 This agreement provided Microsoft with the codecs which were incorporated into Windows

12 Media Player and are now at issue in the instant suit.  (<u>Id.</u> at § 4.1.)  The agreement also

13 granted to Microsoft licenses to patents owned by Fraunhofer necessary to exercise the

14 software licencing rights provided therein.  (<u>Id.</u> at § 4.2.)  Because the '938 patent and

15 therefore the '080 patent is jointly owned by AT&T and Fraunhofer, to the extent the '080

16 patent is necessary to the performance of the Windows Media Player functions accused

17 herein,  Microsoft, through its agreement with Fraunhofer has a license to the '080 patent.

18 <u>See</u> <u>Schering Corp. v. Roussel-UCLAF SA.</u>, 104 F.3d 341, 344 (Fed. Cir. 1997) ("Each

19 co-owner's ownership rights carry with them the right to license others, a right that also

20 does not require the consent of any other co-owner.").  Microsoft as a licensee cannot be

21 liable for infringement of the '080 patent.  35 U.S.C. § 271.  Therefore, the Court **FINDS**

22 that Microsoft has prevailed on its licensing defense and is **NOT LIABLE** for infringement

23 of the '080 patent.  The Court **AMENDS** its Rule 52(b) judgment accordingly.

24 **IV.**    **INFRINGEMENT OF THE '457 PATENT**

25      **A.**    **Direct Infringement**

26       Microsoft argues that no reasonable jury could have found on the evidence presented

27 at trial that the back-up HQ encoder of the Windows Media Player infringed the claims of

28                            14

1  the '457 patent because there was no evidence that the HQ encoder had ever performed the

2  claimed methods.

3         To prove infringement of a methods claim (such as claims 1 and 5 of the '457

4  patent), there must be sufficient evidence that establishes the device is capable of

5  performing the method and that *it indeed performs that method*.  Joy Technologies, Inc. v.

6  Flakt, Inc.,  6 F.3d 770, 775 (Fed. Cir. 1993) ("A method claim is directly infringed only by

7  one practicing the patented method"); see also Ormco Corp. v. Align Technology, Inc., 463

8  F.3d 1299, 1311 n. 12 (Fed. Cir. 2006).

9         There was no direct evidence that the HQ encoder performed the patented methods

10 presented at trial.  Even Lucent's expert, Dr. Polish, testified that he had never observed the

11 HQ encoder running, he had not made a CD encoded by the HQ encoder, and he could not

12 explain how a user would select and run the HQ encoder (over the default fast encoder).

13 (Trial Tr. vol. III, 198:1-199:5, 200:18-24, Jan. 31, 2007.)  Instead, Lucent argues that its

14 proof of infringement centered on circumstantial evidence that the HQ encoder would run

15 automatically when the fast encoder failed and therefore carry out the claims of the '457

16 patent.

17        Circumstantial evidence may be sufficient in some circumstances to prove direct

18 infringement.  Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed.

19 Cir.1986) ("circumstantial evidence of extensive puzzle sales, dissemination of an

20 instruction sheet teaching the method of restoring the preselected pattern with each puzzle,

21 and the availability of a solution booklet on how to solve the puzzle" was sufficient to show

22 direct infringement of patented method claims to solve the Rubik's cube).  On other facts,

23 circumstantial evidence may be insufficient.  E-Pass Technologies, Inc. v. 3Com Corp., 473

24 F.3d 1213, 1222 (Fed. Cir. 2007) (each step of the claimed method was only taught in

25 isolation such that too much speculation was needed to conclude that any customer had

26 ever performed the steps of the method in the order claimed in the patent).

27        Here, the evidence regarding the functioning of the HQ encoder presented an

28                                          15

interesting dilemma. According to Lucent's expert Dr. Polish, the HQ encoder would initialize and run if the default fast encoder of Windows Media Player failed. (Trial Tr. vol. III, 139:13-16; 142:16-20, Jan. 31, 2007.) This analysis was based on his review of the source code. (Id. at 139:17-20, 141:15-24.) Dr. Polish opined that four types of errors would cause the fast encoder to fail. (Id. at 144:7-145:4.) Although he testified that in his opinion, these errors occur in practice, (id. at 146:7-9), he did not know at what rate such errors occurred, nor had he ever observed such errors (id. at 145:23-146:6, 185:8-25, 196:2-14). He also testified that errors that would cause the fast encoder to fail would not cause the HQ to also fail because the two encoders used different initialization tests. (Id. at 146:17-147:9.) Again, this analysis was based on an examination of the source code; Dr. Polish had never seen it happen in practice, nor reproduced it himself. (Id. at 185:1-186:5.) No other witness testified to having observed the HQ encoder perform, nor was there any tangible evidence of such performance. Tellingly, when Lucent's expert was asked if he had tested his theories, he replied in the negative. Although he had available to him a debugger which he successfully used to test the fast encoder's functions as they pertained to the claims of the other patent in suit, the '080 patent (id. at 159:16-160:2), he never attempted to use the same debugger to test for the failure of fast encoder or the running of the HQ encoder (id. at 197:7-13). Furthermore, although he admitted he could have built an apparatus to test for the errors that would make the fast encoder fail and trigger the HQ encoder, he chose not to do so. (Id. at 197:14-19.) When asked if he could even explain to the jury how he would go about making the HQ encoder work, he replied that he could not (Id. at 198:6-17; see also id. at 199:4-5 ("If I could tell you how to do it, I could have done it myself.").)

In essence, Lucent offered circumstantial evidence that proved at most that the HQ encoder was possibly *capable of* running. What it failed to show, circumstantially or

16

otherwise, was that HQ had actually ever run and performed the claimed method.[7] This

evidence is insufficient as a matter of law to demonstrate infringement of a methods claim.

While Lucent argues that "the record was replete with evidence that the HQ encoder will be

invoked as a result of common conditions that occur routinely in practice," as the Federal

Circuit noted in E-Pass Technologies, Inc. v. 3Com Corp., 473 F.3d 1213, 1223 (Fed. Cir.

2007), if it was so common and so routine, certainly Lucent could have introduced

evidence of at least one instance where the HQ encoder had run.

The instant circumstances differ from those of Moleculon, on which Lucent relies.

In that case, there was no question that if a user followed the instruction manual, the

Rubik's cube puzzle would be solved.  Witness testimony established that, in addition to

the circumstantial evidence of instructions to solve the puzzle, many people had been

observed solving the accused Rubik's cube.  Moleculon Research Corp. v. CBS, Inc., 594

F. Supp. 1420, 1440 (D.C. Del. 1984), overruled by Moleculon, 793 F.2d 1261 (Fed.

Cir.1986).  In contrast, here, although according to the source code the HQ encoder could

infringe the claimed methods if it ran, the evidence established only uncertainty and

speculation as to whether it had ever run even once.  Like the circumstances in E-Pass, 473

F.3d at 1222, where the accused personal digital assistant (PDA) could perform many

functions other than the claimed method, here, even according to Lucent's expert, a

computer running Windows Media Player is running dozens of processes, with thousands

of instructions, "there may be bugs.  There may not be bugs.  There's all kinds of things

that could be happening." (Trial Tr. vol. III, 183:20-184:5.)[8]

---

[7] The Court considers here the evidence under the standard for judgment as matter of law. There also was evidence at trial from Microsoft to refute Lucent's theories. However, the jury was not required to believe Microsoft's expert, nor accord him the same weight as Lucent's expert.

[8] The Court also finds Lucent's argument unavailing that simply because the HQ encoder is in Windows Media Player as a backup, it must perform the claimed methods.  Whether or not Microsoft may have intended or attempted to perform the claimed methods with the HQ encoder, the key question is whether the accused software did perform. "Attempted infringement" does not create liability.

1   Given this amount of speculation, the Court finds that Lucent failed to meet its
2   burden to demonstrate by a preponderance of the evidence, direct or circumstantial,
3   performance of the methods claims of the '457 patent by the HQ encoder. Therefore the
4   Court **GRANTS** judgment as a matter of law that the HQ encoder does not infringe claims
5   1 and 5 of the '457 patent. In the alternative, the Court **GRANTS** a new trial as to
6   infringement of these claims. Based on the level of speculation and uncertainty, as well as
7   the lack of any attempt by Lucent or its experts to demonstrate the failure of the fast
8   encoder and/or the performance of the HQ encoder, the Court finds that the jury's verdict
9   of infringement was against the clear weight of the evidence.

10   The remaining claim of the '457 patent at issue, claim 10, is a product-by-process
11   claim. The case law is divided on whether this type of claim is treated as a product claim
12   or more like a methods claim. In <u>Scripps Clinic & Research Foundation v. Genentech, Inc.</u>,
13   927 F.2d 1565, 1583 (Fed. Cir. 1991), one panel of the Federal Circuit ruled that products
14   by process claims "are not limited to product prepared by the process set forth in the
15   claims." One year later in <u>Atlantic Thermoplastics Co., Inc. v. Faytex Corp.</u>, 970 F.2d 834,
16   846 -847 (Fed. Cir. 1992), another Federal Circuit panel ruled "process terms in
17   product-by-process claims serve as limitations in determining infringement." While
18   seemingly in contradiction, this Court resolved the issue relative to the '457 patent based
19   on the context of the claim at issue. Claim 10 reads "A storage medium manufactured in
20   accordance with a process comprising the steps of:" and then lists several steps defining the
21   process. Ignoring the process steps would leave only "a storage medium" as the claimed
22   product, an untenable position since storage media were well known in the art as of the
23   '457 patent. Thus, the Court concluded that claim 10 was limited by these process steps
24   and instructed the jury that "[a] product-by-process claim is a product or 'apparatus' claim
25   that is further defined by one or more steps of a process used to make the product."
26   (Court's Jury Instruction No. 33; docket no. 1168.)

27   Lucent argues that the jury's verdict of infringement of this claim is supported by

28   18

sufficient evidence because it proved that a computer loaded with Microsoft's Windows Media Player is capable of carrying out these process steps. While generally, to infringe a product claim, the accused device need only be capable of infringement, this determination may depend on the claim language. In <u>Intel Corp. v. U.S. Intern. Trade Com'n</u>, 946 F.2d 821, 832 (Fed. Cir. 1991), the use of the phrases "programm *able* selection means" and "whereby *when* said alternate addressing mode is selected" led the Court to conclude that the device need only be capable of operating in such a manner rather than requiring proof of such actual operation. In contrast, in <u>Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.</u>, 424 F.3d 1293, 1310-12 (Fed. Cir. 2005), the Court found the term "operatively joined" to be a structural limitation such that an accused device would only infringe if it actually was joined, but not if it was simply "capable of" being joined.

Here, the claim language resembles that in <u>Cross Medical</u>. Claim 10 uses the term "manufactur*ed* in accordance with a process comprising" indicating that to infringe the claim, the accused storage medium must have been made using the process, rather than one that is made in another manner but capable of carrying out the process. There was no evidence at trial that anyone had ever made anything with the claimed process.[9] As Lucent's expert admitted, he had not even attempted to make the HQ encoder run, let alone derive a storage medium product (such as a CD with an mp3 file) made by the HQ encoder. Therefore, the Court finds that as a matter of law, the evidence presented at trial cannot support a finding of infringement of claim 10. Microsoft's motion for judgment as a matter of law of no infringement of claim 10 is **GRANTED**.

Alternatively, the Court also **GRANTS** Microsoft's motion for a new trial on the infringement of claim 10. The new trial is granted on two grounds. First, for the same reasons as found for claims 1 and 5, the clear weight of the evidence does not support the jury's finding of infringement of claim 10. Second, the Court finds that there was a conflict

---

[9] The process steps of claim 10 are essentially the method steps set out in claim 1.

19

in the jury instructions which may have provided an erroneous standard for the jury. Although the Court's Jury Instruction No. 32 correctly instructed the jury that "[i]n order to literally infringe a product-by-process claim, you must find that each step of the process is literally performed in making the accused product," the Court's Jury Instruction No. 33, instructed "[a]n accused product may be found to infringe a product-by-process-claim if the accused product is manufactured so that it is capable of using the steps of the process as they are recited in the claim." (See Court's Jury Instructions; docket no. 1168.) The jury may have therefore decided the question of infringement of claim 10 on the erroneous standard set out in the latter instruction.

### B.    Indirect Infringement

"Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement." Joy Technologies, Inc. v. Flakt, Inc., 6 F.3d 770, 774 (Fed. Cir. 1993). In light of the Court's rulings on no direct infringement, the Court therefore **GRANTS** judgment as a matter of law and in the alternative, a new trial on indirect infringement. Although Microsoft raises other grounds in its motions, the Court need not and does not address them here.

## V.    INFRINGEMENT OF THE '080 PATENT

Although as analyzed herein, Lucent lacks standing to sue for infringement of the '080 patent and Microsoft has a license through its agreement with Fraunhofer to practice the '080 patent with regards to the accused encoders, the Court alternatively rules herein on Microsoft's motions for judgment as a matter of law and for new trial pertaining to infringement issues, as well as invalidity and damages issues on the '080 patent.

### A.    Claim Construction

Microsoft contends that the Court's claim construction of the element (c) in claim 1 of the '080 patent was overly broad and therefore a new trial is warranted. Element (c) reads:

(c) using a rate loop processor in an iterative fashion to determine a set of

20

1

> quantization step size coefficients for use in encoding the set of frequency coefficients, said set of quantization step size coefficients determined by using the masking threshold and an absolute hearing threshold;

2

3    Microsoft argues that the Court's claim construction encompassed combining the masking

4    threshold and absolute hearing threshold as an "input" to the rate loop. It argues that the

5    prosecution history required the "use" of both thresholds within the rate loop itself.

6        This issue was considered during the Markman hearings and the Court ruled that the

7    claim was not limited to the use of both thresholds within the rate loop. Microsoft has

8    provided no new arguments on this point. It simply asserts the issue here to preserve it for

9    appeal. Therefore, the Court **DENIES** Microsoft's motion for a new trial on this ground.

10        **B.    Direct Infringement**

11        Microsoft contends in cursory fashion that there was insufficient evidence for the

12    jury to have concluded that the pbThresholdQuiet of the accused products meets the

13    Court's claim construction for an absolute hearing threshold (AHT) in the '080 patent

14    claims. Microsoft argues that its expert testified to just the opposite, that pbThresholdQuiet

15    was not the AHT of the patent. Lucent, however, points to testimony of its own expert that

16    pbThresholdQuiet is an AHT. Additionally, Lucent points to the cross-examination of

17    Microsoft's expert where Lucent used the expert's own report to impeach him; the report

18    stated that pbThresholdQuiet is an AHT. The Court finds that the jury had sufficient

19    evidence on which it could have based its finding of infringement.

20        Microsoft also argues that the Court's refusal to allow reference to the judgment in

21    the Dolby case (a suit on the predecessor '938 patent against Dolby's technology)

22    prejudiced Microsoft's ability to show non-infringement. At the hearing on Lucent's

23    motions in limine, the Court excluded the findings in Dolby as hearsay, although it allowed

24    the parties to use statements made in that case by witnesses or parties for purposes of

25    impeachment. (Transcript in limine Hr'g, 113:7-9; 114:21-115:1, Jan. 3, 2007.) Microsoft

26    has not offered an exclusion, exemption or exception to hearsay under the rules of evidence

27    which would suggest that this decision was in error. Furthermore, Microsoft primarily

28    21

argued in its opposition to this motion in limine that the evidence was relevant to
willfulness and/or impeachment of witnesses, not as direct evidence of non-infringement.[10]
Thus, the exclusion was not in error and there was no prejudice to Microsoft.  Microsoft's
motions for judgment as a matter or law and for a new trial on the issue of direct
infringement of the '080 patent are **DENIED**.

### C.    Contributory Infringement by All of the Accused Encoders

Microsoft argues that the jury's findings on contributory infringement are wrong and
against the clear weight of the evidence in light of the recent holding by the Supreme Court
in Microsoft Corp. v. AT & T Corp., 127 S. Ct. 1746, 1750 (2007).  Microsoft contends
that the AT&T holding addressing foreign sales under 35 U.S.C. § 271(f) also should be
applied to infringement under § 271(c) for domestic sales.

This Court has no reason to interpret AT&T so expansively.  One of the key
concerns regarding § 271(f) is the effect of U.S. patent law on extraterritorial activities.
"The traditional understanding that our patent law operates only domestically and does not
extend to foreign activities . . . is embedded in the Patent Act itself, which provides that a
patent confers exclusive rights in an invention within the United States."  Id. at 1758
(internal quotations and citation omitted).  This concern does not infect § 271(c).  While
domestic patent laws more readily govern facilitation and inducement of infringement, §
271(f) is limited to components supplied for a combination that will be made outside the
United States.

There is no precedent for limiting the scope of § 271(c) to the limits placed on §
271(f).  Just as the Supreme Court declined to remedy potential inconsistencies or
loopholes in the patent laws and left such issues for Congress to address, here too, this
Court leaves the legislature to consider whether supplying software as an "intangible"

---

[10] (See Transcript in limine Hr'g, 113:10-19, Jan. 3, 2007.)  Microsoft prevailed on the issue
of willfulness at trial, regardless of the exclusion.  With respect to infringement and validity issues,
Microsoft primarily argued the Dolby case was relevant because of the inconsistent positions taken
by Lucent and its witnesses.  The Court permitted the use of testimony from Dolby for these purposes.

should be exempted from § 271(c). Microsoft's motion for a new trial on contributory infringement is **DENIED**.

### D.    Indirect Infringement by the Cyberlink Encoder

Microsoft challenges the sufficiency of the evidence for the jury's verdict on contributory infringement and inducing infringement of the '080 patent by the Cyberlink plug-in encoder. Regarding contributory infringement, Microsoft, in a cursory fashion, contends that Lucent failed to introduce sufficient evidence because Windows Media Player with the Cyberlink plug-in encoder has substantial noninfringing uses. The Court, however, finds no evidence of any other uses for the Cyberlink plug-in encoder in the record. Simply packaging the Cyberlink plug-in encoder with the Windows Media Player, a device that itself has many other functions, does not insulate the encoder from infringement. Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 945 (Fed. Cir. 1990) (the addition of features to a patented device or the addition of functions to a device performing a patented method does not avoid direct infringement).[11] Therefore, Microsoft's motions for judgment as a matter of law and for a new trial as to contributory infringement by the Cyberlink plug-in are **DENIED**.

As for inducing infringement, Microsoft contends that the element of specific intent was not met because there was no evidence that Microsoft knew how the Cyberlink product functioned and additionally, that there was little or no evidence of inducement other than a website link. As to the website, evidence and testimony was presented showing that Microsoft advertised its products with a link to the Cyberlink plug-in to provide users with their choice of features; thus a jury could conclude that such advertising was sufficient encouragement and/or instructions for inducement.

---

[11] This is not the circumstances present in Hodosh v. Block Drug Co., Inc., 833 F.2d 1575, 1578 (Fed. Cir.1987) and Aquatex Industries, Inc. v. Techniche Solutions, 419 F.3d 1374, 1380 n.* * (Fed. Cir.2005), where a patented product incorporated a staple ingredient (and hence selling the staple was not contributory infringement). Here, the Cyberlink Plug-in is not a staple, and incorporating it into Windows Media Player does not somehow "convert" it into a staple ingredient.

However, the Court finds that there was insufficient evidence to show that Microsoft had any knowledge that the Cyberlink encoder was an infringing device. The testimony pointed to by Lucent on this issue demonstrates only that the binary code (machine code) was provided to Microsoft by the Cyberlink Corporation; the source code was not provided. (Trial Tr. vol. X, 26:22-27:4, Feb. 12, 2007.) Lucent does not point to any evidence or testimony that would explain how Microsoft should have known from the binary code that the Cyberlink plug-in infringed the '080 patent. According to the testimony of the witness from Cyberlink, the function of the encoder with regard to encoding mp3 files was never discussed with Microsoft. (Id. at 27:24-28:23.) Therefore, as to inducing infringement as it relates to Windows Media Player with Cyberlink plug-in, the Court finds that there was insufficient evidence to demonstrate that Microsoft knew or should have known that its aid or encouragement would cause the infringement of the '080 patent; judgment as a matter of law on this issue is **GRANTED**. Alternatively, because the jury's verdict was against the clear weight of the evidence, the Court **GRANTS** a new trial on this issue.

## VI.    INVALIDITY DEFENSES

### A.    Anticipation/Obviousness of the '080 Patent: the OCF Paper

Microsoft contends that Lucent failed to present any evidence to rebut Microsoft's prima facie case that the OCF Paper rendered claim 4 of the '080 patent anticipated and/or obvious. However, as Lucent argues, the jury may have reached its verdict because Microsoft failed to demonstrate invalidity by clear and convincing evidence and/or because Lucent's expert Dr. Jayant provided amble rebuttal evidence.

Microsoft's expert Dr. Brandenburg testified that claim 4 (a means-plus-function claim) had several overlapping elements with claim 1 (Trial Tr. vol. VII, 88:16-89:2, Feb. 6, 2007.) These overlapping elements were analyzed in detail with regard to claim 1. (Id. at 78:19-87:4.) In contrast, Brandenburg addressed the means-plus -function element of claim 4, which is not an element in claim 1, in only a cursory fashion. (Id. at 91:4-13.) Although he testified about function of this element, he did not opine where the

24

1  corresponding structure could be found in the prior art. Absent this testimony, the jury may
2  have found his analysis lacking.

3  As for rebuttal evidence, Lucent's expert Dr. Jayant testified that elements (c) and
4  (d) of claim 1 were not found in the OCF paper, nor was it obvious to combine other art to
5  arrive at these claim limitations. (Trial Tr. vol. XI, 78:24-90:4, Feb 13, 2007.) As
6  explained above, these claim limitations overlapped those of claim 4 and would thus be
7  missing in both claims. Therefore, the Court finds that there was ample evidence in the
8  record to support the jury's findings that the OCF Paper did not anticipate the '080 patent
9  or render it obvious. Microsoft's motions for judgment as a matter of law and a new trial
10 on this issue are **DENIED**.

11    **B.    Failure to Swear Behind Low Bit Rate Paper**

12 Microsoft also contends that a jury could not have found the '080 patent valid in
13 view of the Low Bit Rate Paper. It claims that Lucent failed to provide any evidence to
14 swear behind this reference and thus, the Low Bit Rate Paper was definitively prior art.

15 As for the status of the paper as prior art, Microsoft contends that all the evidence
16 establishing the date of invention of the '080 patent came from the uncorroborated
17 testimony of the inventor Johnston. In response, Lucent points to the corroborating
18 evidence of a technical memo and a publication by Johnston.[12] Irrespective of the
19 corroboration issue, however, as discussed supra, Johnston's testimony and supporting
20 documentation cannot support a priority date of 1988 for all of the claims of the '080
21 patent. In particular, they do not establish a date of invention earlier than the '938 patent
22 itself for claim 4 which contains specific corresponding structure for the means-plus-

23
24 [12] As to the technical memo, it has Johnston's signature and also an additional unlabeled
   "signature." (PX128.) Lucent claims it is Dr. Jayant's signature and Microsoft has not challenged this
25 assertion. This latter signature acts as the necessary corroboration to establish a date of invention.
   See
26 Finnigan Corp. v. International Trade Com'n, 180 F.3d 1354, 1369 (Fed. Cir. 1999)(establishing that
   "corroboration is required of any witness whose testimony alone is asserted to invalidate a patent,
27 regardless of his or her level of interest" and distinguishing prior cases such as Thomson, S.A. v.
   Quixote Corp., 166 F.3d 1172, 1176 (Fed. Cir. 1999) which stated otherwise).

28                                25

1  function limitations.  Therefore, the Low Bit Rate Paper which was published before the

2  '938 patent may be considered prior art at least for claim 4.

3       Even so, Microsoft's contention that a jury could have only found that this reference

4  anticipates the '080 patent meets with problems.  First, as Lucent points out, Microsoft had

5  the burden to demonstrate anticipation by clear and convincing evidence.  Dr. Strawn,

6  Microsoft's only witness on this topic, did not opine on claims 1 and 3 and only offered

7  conclusory testimony as to claim 4, simply "checking off" on a chart that each element of

8  the claim was present in the reference.[13]  (Trial Tr. vol. VIII, 200:3 - 205:4, Feb. 7, 2007.)

9  This testimony alone cannot be considered substantial evidence put before the jury.  See

10  Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1152 (Fed. Cir. 2004)

11  ("[T]estimony concerning anticipation . . . must identify each claim element, state the

12  witnesses' interpretation of the claim element, and explain in detail how each claim element

13  is disclosed in the prior art reference. The testimony is insufficient if it is merely

14  conclusory." (quoting Schumer v. Lab. Computer Sys., Inc., 308 F.3d 1304, 1315-16 (Fed.

15  Cir.2002))).  The Court thus finds that the jury's verdict was supported by substantial

16  evidence and **DENIES** Microsoft's motion for judgment as a matter of law on this ground.

17     **C.    Exclusion of Mr. Johnston's Testimony**

18       Microsoft asserts that it wished, but was not permitted, to elicit Johnston's testimony

19  that Lucent's interpretation of the '080 patent claims was over-broad and rendered the

20  patent invalid.  It argues that this exclusion substantially prejudiced the outcome against

21  Microsoft.

22       The Court finds that this exclusion was not in error and did not result in any

23  prejudice.  First, as to the scope of Johnston's testimony, at the motions in limine hearing

24  before trial, Microsoft told the Court that Johnston would not be giving an opinion on

25

26       [13] While Strawn also testified that this analysis was covered in his expert report, he did not

27  further elaborate to say whether the report was also equally as conclusory or more detailed, nor was
the report put into evidence. (Trial Tr. vol. VIII, 205:10-12, Feb. 7, 2007.)

28                                     26

invalidity; he would testify as a fact witness on issues such as the circumstances surrounding the filing of the reissue application. (Transcript in limine Hr'g, 26:23-27:12, Jan 3. 2007.) To the extent Microsoft wished to elicit additional testimony at trial, it should have raised this in a timely manner, especially in light of its prior statement to the Court.

Second, while Microsoft argues that an inventor's testimony may be used to invalidate a patent, the relevance of Johnston's possible testimony on this issue is questionable at best. An inventor's subjective opinion as to the interpretation of the claims is no longer relevant. "[O]nce the patent issues, the claims and written description must be viewed objectively, from the standpoint of a person of skill in the art." Solomon v. Kimberly-Clark Corp., 216 F.3d 1372, 1380 (Fed. Cir. 2000). Here, Johnston was not designated as an expert witness and thus could not offer opinions as to invalidity. Further, Microsoft has not indicated any facts that Johnston would have offered that would have possibly changed the outcome here.

Third, Microsoft's primary objective for Johnston's testimony as expressed during the motions in limine hearing and at side-bar during trial was to elicit facts regarding the circumstances of the reissue application that could be relevant to inequitable conduct in procuring the patent or the reissue. (Transcript in limine Hr'g, 26:23- 27:12, Jan 3. 2007; Trial Tr. vol. VI, 73:8-79:13, Feb. 5, 2007.) The Court permitted this testimony at trial and therefore Microsoft suffered no prejudice on this issue.. (Trial Tr. vol. VI, 83:13-84:5, Feb. 5, 2007.) Therefore, the motion for a new trial on this ground is **DENIED**.

### D.    Impact of KSR Intern. Co. v. Teleflex Inc.

Based on the recent U.S. Supreme Court's ruling in KSR Intern. Co. v. Teleflex Inc., 127 S. Ct. 1727 (2007), Microsoft moves for judgment as a matter of law and/or new trial on obviousness.[14]  Having considered the evidence presented at trial and the instructions

---

[14] The decision in KSR issued on April 30, 2007, almost two months after the verdict in the instant Group 2 trial. Since this trial remains here on direct review, KSR's holding applies. See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 90 (1993) ("[the Supreme] Court's application of a rule of federal law to the parties before the Court requires every court to give retroactive effect to

given to the jury on obviousness, the Court finds that neither judgment as a matter of law or a new trial is warranted. The standard used at trial was consistent with <u>KSR</u> and Microsoft has not persuaded the Court that the obviousness analysis would have proceeded any differently had the ruling in <u>KSR</u> been available at the time of the trial.

The Court's instructions to the jury did not require an explicit teaching or suggestion to combine:

> In deciding whether to combine what is described in various items of prior art, you **may consider whether or not there was some motivation or suggestion** for a skilled person to make the combination covered by the patent claims. The motivation or suggestion to combine the teachings of different prior art references **may be found either explicitly or implicitly** in the references themselves **or in the knowledge generally available** to one of ordinary skill in the art.

(Court's Jury Instruction No. 51; docket no.1168 (emphasis added)). Although Microsoft argues that the instruction should have explicitly stated that a suggestion or motivation to combine was not required, <u>KSR</u> does not completely remove these considerations from the analysis: "a patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." <u>KSR</u>, 127 S. Ct. at 1741. A reason for the combination is still an important consideration, even though it need not be a rigid formula, nor "a formalistic conception":

> Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

<u>Id.</u> at 1740 -1741. <u>KSR</u> also reaffirmed familiar principles set out in <u>Graham v. John Deere Co. of Kansas City</u>, 383 U.S. 1, 17-18 (1966). <u>KSR</u>, 127 S. Ct. at 1739. The jury instructions here mirrored these <u>Graham</u> factors, and did not require a rigid or explicit teaching, suggestion or motivation to combine. The jury therefore considered the obviousness question under instructions compatible with <u>KSR</u>.

---

that decision").

28

Microsoft's contentions that the testimony from Dr. Jayant (Lucent's expert) was in contradiction with the KSR standard are unfounded.   Jayant stated that he disagreed with the conclusion of Microsoft's expert, who had opined that the citation of the book on psychoacoustics within the OCF paper would lead one of ordinary skill in the art to combine the two to result in the invention of the '080 patent:

> . . . what you're letting the reader know in the OCF paper is that there's this book that exists on psycho-acoustics. And that, by itself, doesn't mean that it teaches the reader to go into that book and look at one particular part in the book that indeed goes into absolute thresholds and so on, let alone put everything together to come up with the inventions of the claims of the 080 patent.

(Trial Tr. vol. XI, 89:22-90:4, Feb. 13, 2007.)  This testimony is not in contradiction with KSR which requires more than simply combining previously known elements from the prior art. KSR, 127 S. Ct. at 1741. Jayant's reference to the impermissible use of hindsight analysis also is not in contradiction with KSR. "A factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." Id. at 1742

Finally, the Court is unpersuaded that KSR's "broad implications" warrant reopening discovery and searching for new prior art.  Although Microsoft points out that this Court allowed reopening of discovery in Groups 4 and 5, the circumstances differ here. Groups 4 and 5 had not started trial before the KSR ruling came out, whereas the Group 2 trial has been completed.  Additionally, an examination of district court and Federal Circuit rulings on obviousness since the KSR decision does not support Microsoft's requested upheaval.[15]  In sum, Microsoft has not offered any meritorious reason why obviousness on

---

[15] See e.g., Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd., - - F.3d - - , 2007 WL 1839698, *4 (Fed. Cir. June 28, 2007) (finding that the district court's analysis of obviousness using the Graham factors was consistent with an analysis under KSR); Leapfrog Enterprises, Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1162 (Fed. Cir. 2007) (affirming the district court's finding that reasons in the industry to combine elements were sufficient to show obviousness); Sundance, Inc. v. De Monte Fabricating, Ltd., 2007 WL 1655423, *2 (E.D. Mich. June 7, 2007) (denying judgment as a matter of law and/or new trial because the jury's obviousness determination did not use a rigid TSM test and thus was consistent with KSR); Stryker Trauma S.A. v. Synthes (USA), 2007 WL 1959231, *6 n.6 (D. N.J. June 29, 2007) (finding that substantial evidence supported the jury's verdict of no obviousness because there was no evidence the jury applied a rigid "TSM" test and sufficient evidence

the '080 patent should be re-tried or why the jury's verdict as to non-obviousness of the '080 patent was not support by sufficient evidence. Therefore, the motions for judgment as a matter of law and for a new trial on obviousness are **DENIED**.

Regarding the '457 patent, an obviousness defense was not pursued by Microsoft at summary judgment or at trial.[16] Microsoft made a tactical choice not to pursue this defense; it has made no showing that the defense was discarded because of the rigid TSM test or some other factor changed by KSR. Microsoft should not get another "bite at the apple" simply because it might have chosen a different strategy if KSR had already been decided. Case law is always a moving target and a party must keep that in mind when making tactical decisions. Therefore, the motion for a new trial on these grounds regarding the '457 patent also is **DENIED**.

## VII.  DAMAGES

By statute, the damages for infringement are set at an amount "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." An award of damages by the jury "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." Monsanto Co. v. Ralph, 382 F.3d 1374, 1383 (Fed. Cir. 2004) (quoting Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1580 (Fed. Cir.1992)).

Microsoft sets forth several grounds on which it argues that the jury's damages verdict should be overturned as a matter of law and/or a new trial should be granted: (1) the royalty rate and the royalty base used to calculate a reasonable royalty; (2) the lack of consistency of the jury's numeric calculations; (3) the impact of the Supreme Court's recent holding in Microsoft Corp. v. AT & T Corp., 127 S. Ct. 1746 (2007); and (4) the sway of

---

that the verdict was supported with an analysis using only the Graham factors).

[16] At summary judgment Microsoft put forth only anticipation on this patent; it was denied because of issues of fact. Microsoft did not pursue even this invalidity defense at trial.

passion and prejudice on the jury. These are each reviewed below.

**A.    The Royalty Base - Application of the Entire Market Value Rule**

Lucent presented a damages model based on a reasonable royalty for the patent; the model presented was a 0.5% royalty rate applied to the average price of a personal computer over the relevant years. Microsoft now argues that there was insufficient evidence to support the application of the entire market value rule on which Lucent predicated the royalty base on the cost of the entire computer.

The entire market value rule is applicable where patented and unpatented components are sold together as a functional unit "so as to produce a desired end product or result." Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1550 (Fed. Cir. 1995). Moreover, the patented component must be "the basis for customer demand or "substantially create the value of the component parts." Id. at 1549.

Two major problems arise in applying the entire market value rule here. The first is the failure of the evidence to establish a link between the cost of the *computers* (rather than the operating system, Windows Media Player, the MP3 codec or some other "unit") and the customer demand or value of the patented technology. The second and probably even more troublesome problem is the failure to establish that the patented features themselves produced any customer demand or value of the product.

The accused products were the HQ and fast encoders present in Windows Media Player. Lucent failed to establish at trial that a commercial necessity and/or desirability of these features was required in computers. Instead, Lucent established at most that there was a desirability that personal computers carry MP3 capabilities. Thobias Jones, a software design engineer at Microsoft, testified that MP3 was a popular request from users who desired Windows Media Player. (Trial Tr. vol. IV, 14:1-13, Feb. 1, 2007.) Dell representative Leonard Zwik testified that Windows Media Player was an integrated function of the computer's operating system and that Dell would not sell a Windows operating system without Windows Media Player. (Id. at 72:5-73:1.) He also testified that

1   there was no customer demand for the version of Windows (XP-N) that lacked Windows

2   Media Player. (Id. 73:2-74:10.)  Witness David Fester, general manager of the Microsoft

3   Windows Digital Media Division testified that MP3 was a feature which attracted users to

4   Windows Media Player.  (Id. at 85:23-86:7).  Finally, Microsoft employee Geoff Harris,

5   responsible for the development of the Windows Media Player product, testified that there

6   was a market need and consumer demand for MP3 encoding capabilities. (Id. at 112:16-

7   113:2.)  The sum of this evidence establishes at most a market demand for an operating

8   system containing Windows Media Player with MP3 capabilities.  It does not establish that

9   the demand for *computers* is based on Microsoft's Windows Media Player and/or MP3

10  technology.

11        Even more problematically, however, is the lack of evidence showing that the

12  patented features set forth in the claims of the '457 and/or '080 patents were the basis for

13  customer demand and/or the substantial value of the product sold.  Importantly, neither the

14  '457 patent nor the '080 patent covers MP3 capability per se.  Rather, each patent relates to

15  a particular *feature* of MP3 capability.[17]  Hence, to apply the entire market value rule, the

16  evidence must show that these features were the basis of the customer demand or

17  substantially created the value of the product.  See e.g., Fonar Corp. v. General Elec. Co.,

18  107 F.3d 1543, 1549, 1553 (Fed. Cir. 1997) (the multi-angle oblique (MAO) imaging

19  feature claimed in the patent was emphasized as a selling feature in the device found to

20  infringe and thus a reasonable royalty was correctly based on the cost of the entire device);

21  Bose Corp. v. JBL, Inc., 274 F.3d 1354, 1361 (Fed. Cir. 2001) (entire loudspeaker cost

22  was the proper royalty base where the patented feature functioned as one unit with the other

23

24  _____

    [17] Lucent's own witness Dr. Jayant, testified that MP3 technology originated from many
    sources and is composed of many features, including the bit stream syntax (how the bit stream is
25  interpreted and meaningfully decoded to play back the audio signal), features of the decoder and some
    features of the encoder. (Trial Tr. vol. II, 121:11-23, 123:2-22, Jan. 30, 2007.) In contrast, the claims
26  at issue related to only particular features that could be used in conjunction with MP3 encoders. The
    '457 patent relates to the methods of audio coding using a tonality value and a masking threshold. The
27  '080 patent relates to methods and apparatus for audio coding which incorporates the use of an
    absolute hearing threshold in conjunction with a masking threshold.

28                                        32

components to provide the desired audible performance, the patented feature improved the performance of the loudspeaker, and the improved performance was the basis for the customer demand); Tec Air, Inc. v. Denso Mfg. Michigan Inc., 192 F.3d 1353, 1362 (Fed. Cir. 1999) (damages based on entire assembly of motor, radiator and condensor where the performance of the whole assembly was important to the customer, the fan was required for the assembly and the patented method of balancing the fan was critical to the function of the assembly and important to customer demand for the assembly); compare e.g., Imonex Services, Inc. v. W.H. Munzprufer Dietmar Trenner GMBH, 408 F.3d 1374, 1380 (Fed. Cir. 2005) (insufficient evidence for the entire market rule where the patented feature, which differentiated which coins were put into the machine, was not shown to be the basis for the customer demand of the entire laundry machine); Medtronic, Inc. v. Catalyst Research Corp., 547 F. Supp. 401, 414 (D.C. Minn. 1982) (the cost of entire pacemaker could not be the royalty base where value of the pacemaker was not substantially due to the patented features of the battery).

Here, the Court finds no evidence adduced at trial that establishes that the patented features of either the '457 or the '080 patents were critical to MP3 or that they established the basis for the customer demand or value of MP3, let alone were critical or provided value to the whole computer. The evidence cited by Lucent from the trial record shows only that MP3 capabilities *overall* were a commercially important feature. According to Lucent's expert Dr. Jayant, MP3 technology originated from many sources and the MP3 standard specifies many aspects of audio compression. (Trial Tr. vol. II, 121:11-123-22, Jan 30, 2007.) Although Jayant pointed out what he considered important in the MP3, the key technology he identified related to the decoding of the bit stream syntax (which allows decoders from different manufactures to interpret and play back the audio signal); he did

33

not identify either the invention of the '080 patent or the '457 patent as critical to MP3.[18] (Id. at 123:2-22.)  Additionally, the evidence demonstrated that although the inventions of these patents could be used with the MP3 standard, they were not required or critical to practice the MP3 standard.

Finally, Lucent's assertion that even absent application of the entire market value rule, the use of the computers as a royalty base was correct because Microsoft has joint and several liability for Dell's and Gateway's infringement, is misplaced.  Although an indirect infringer may be liable for all damages attributable to infringing sales, Water Tech., 850 F.2d 660, 669 (Fed. Cir. 1988); Glenayre v. Jackson, 443 F.3d 851 (Fed. Cir. 2006), simply because Dell and Gateway sell computers does not automatically designate the computer as the royalty base. The same foundation for application of the entire market value rule would have been required even if Lucent had been in direct litigation with Dell and Gateway.  In the absence of this nexus, Lucent may only recover damages for the value of the patented technology itself, regardless of the named defendant.[19]

In sum, the Court finds that there was insufficient evidence to establish the required nexus between the patented features and the value of the entire computer and therefore, the jury's application of the entire market value rule to the computer was unsupported as a matter of law.  On this basis, Microsoft's motion for judgment as a matter of law on the damages award is **GRANTED**.  Lacking sufficient evidence to establish the proper royalty

---

[18] Additionally, although Lucent point to the testimony of Microsoft's witness Dr. Brandenburg as evidence that the patented features were essentially MP3, this testimony established at best that the technology which improved upon the '457 patent, set forth in U.S. Patent No. 5,040,217 ("the '217 patent"), was incorporated as an optional psychoacoustic model in the MP3 standard. He testified that the '217 patent was the basis of AT&T's (along with other companies') submission to the MP3 standard (ASPEC submission). According to Brandenburg, the '938 patent (on which the '080 reissue patent is based) was not even around when this submission was made. (Trial Tr. vol. VII, 13:2-17, 15:10-17, Feb. 6, 2007.) He also stated that this technology was optional for the MP3 standard. (Id. at 191:4-11.)

[19] Aside from the issue of the entire market value rule, Microsoft disputes generally that Lucent offered sufficient evidence of any value of the accused HQ and fast encoders to justify the $1.53 billion verdict.  Since this issue is intertwined with the establishment of a proper royalty base on which a new trial is granted, the issue need not and is not further addressed here.

34

base (both what the base would be and its cost) from the evidence at trial, the Court also **GRANTS** a new trial to determine damages.

### B. Royalty Rate

Microsoft contends that there was insufficient evidence for the 0.5% royalty rate utilized by the jury in the damage award. Since, as explained herein, the base used in the reasonable royalty calculation must be reconsidered, this will likely influence selection and therefore require reconsideration of the royalty rate. However, the Court considers some of the issues pertaining specifically to the royalty rate here.

Under Georgia Pacific, a hypothetical negotiation may consider royalties received for the patents in suit and licenses for comparable technologies. Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (D.C.N.Y. 1970). The parties presented differing perspectives on these factors. Lucent focused on a single license it had made for the '457 and '080 patents, the knowledge of its licensing expert obtained from his experiences licensing IBM's hardware technology and a single royalty-bearing agreement made by Microsoft. Microsoft's evidence concentrated on recent licenses it had made with SISVEL (Societa Italiana Per Lo Sviluppo Dell Electtronica) for MP3 technology, Microsoft's agreements with Fraunhofer for the HQ and fast encoder software and Microsoft's agreements with other companies exchanging other software technologies. Each perspective had its strengths and weaknesses, and yet, the overall result offered the jury very little guidance in setting a royalty rate applicable to the technology and parties at hand.

With regard to Lucent's license of the technologies in suit here, it had only a single example of a royalty-based license (PX 1532; Trial Tr. vol. IV, 161:1-162:8, 163:8-14, Feb. 1, 2007) and this was made on a scale far smaller than would be relevant here.[20] See

---

[20] Lucent's expert Roger Smith testified that although the patents in suit had been licensed to a number of players in the industry (e.g., IBM, HP, Sony), these licenses were all broad cross licenses from which it was difficult to discern the value of the instant patents. (Trial Tr. vol. IV,159:20 - 160:25, Feb. 1, 2007.) The single license example (the Nel-Tech license), although offering a 1%

1    Unisplay, S.A. v. American Electronic Sign Co., Inc., 69 F.3d 512, 519 (Fed. Cir. 1995)

2    (evidence of licensing proposals and agreements probative but insufficient because the

3    scale of the license was not comparable). Lucent's expert Roger Smith testified that

4    Lucent's "best licensing practices" document specified  a 1-5% royalty rate assessed on the

5    product sold.  (Trial Tr. vol. IV,155:20-156:9, Feb. 1, 2007.)  He also testified about

6    internal Lucent documents which indicated that Lucent intended to license its MPEG and

7    audio standard patents at 0.5%. (Id. at 156:22 - 157:4, 157:25-158:19.)  Whether these

8    rates were ever implemented and could be considered an established rate was not apparent

9    from the record. See Trell v. Marlee Electronics Corp., 912 F.2d 1443, 1446 (Fed. Cir.

10   1990) ("for a royalty to be established, it must be paid by such a number of persons as to

11   indicate a general acquiescence in its reasonableness by those who have occasion to use the

12   invention"); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983)

13   ("mere offers to license" without actual consummated licenses are insufficient to show an

14   "established" royalty rate for the technology).

15        Smith also testified that 1% royalty to use IBM's products was the norm in the

16   computer industry.  However, such licenses (see e.g., PX1560) were hardware licenses, not

17   licenses for software or features of software comparable to the products in suit.  Other than

18   IBM's hardware licenses, Smith referred to the industry norm set out in an article (PX

19   1505), but again this was a survey of royalties for computer hardware; the article did not

20   address the software industry, let alone any connection to the MP3 technology at hand here.

21   Smith did not explain why the same royalty rate would apply in licensing the technology at

22   suit here.

23   _____

24   royalty on MP3 products incorporating the instant patents, generated only $1450 in its first quarter.
     (Id. at 163:6-14.)  Moreover, this license was entered into between Lucent and NelTech in 2005, two

25   years after the initiation of the instant suit (Trial Tr. vol. V, 26:19-27:1, Feb. 2, 2007.)  The date of
     the hypothetical negotiation is set just before the infringement began. Panduit Corp. v. Stahlin Bros.

26   Fibre Works, Inc., 575 F.2d 1152, 1158 (Fed. Cir. 1978).  Lucent's expert asserted that his calculations
     were based on a hypothetical negotiations date of 1988 (Trial Tr. vol. IV, 150:2-5, Feb. 1, 2007);

27   although he claimed that if Microsoft's model of a date at 1997 or 2004 was used, his calculations
     would not change. (Id. at 150:6-19)

28                                              36

1    Lucent also had a single example of royalty rate based agreements between
2    Microsoft and another company; the Microsoft-Stac agreement was offered by Smith as an
3    example of a 1-2% royalty-bearing agreement. (Id. at 174:2-9; PX1534.)  Most of
4    Microsoft's agreements were for lump sum payments (see e.g., Trial Tr. vol. IV, 170:11-20,
5    172:5-11, and 172:3-7, Feb. 1, 2007)  and were categorized by Smith as software licenses
6    with narrower rights than a patent license (id. at 168:16-169:13).

7    Microsoft, on the other hand, brought forward two sets of agreements related to MP3
8    technology.  One set was composed of two agreements executed between Microsoft and
9    Fraunhofer for the very software code at issue in the infringement here.  Microsoft paid a
10   total of $16 million. (PX34, PX36.)  These agreements were criticized by Lucent's expert
11   as software agreements with only the minimum patent rights necessary to use the licensed
12   code. (Trial Tr. vol. V, 6:23-7:16, Feb. 2, 2007.)  The agreements did not grant any rights to
13   use Fraunhofer's patents for technologies divorced from the source and object code
14   provided with the license. The hypothetical negotiation here was not necessarily limited to
15   a patent license for only specific software code.  See Trell v. Marlee Electronics Corp., 912
16   F.2d 1443, 1447 (Fed. Cir. 1990) ("A particular fee is not the correct measure of damages
17   unless that which is provided by the patentee to its licensees for that fee is commensurate
18   with that which the defendant has appropriated." (quoting Bandag, Inc. v. Gerrard Tire Co.,
19   Inc., 704 F.2d 1578, 1582 (Fed. Cir.1983))).

20   The second agreement was between Microsoft, Audi MPEG and SISVEL (Societa
21   Italiana Per Lo Sviluppo Dell Electtronica) concerning rights to a group of patents for audio
22   coding. (DX 6715.)  The royalty was $0.30 per software copy with a maximum of $5.625
23   million payment.  (Id. § 4.02.)  The relevance of this agreement to the hypothetical
24   negotiation is questionable, as the SISVEL agreement was executed in November 2006,
25   only a few months before the commencement of the instant trial.  See Panduit Corp. v.
26   Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (Fed. Cir.1978) (the hypothetical
27   negotiation is set just before the date of infringement).

28

In sum, it is not so much that the jury lacked any evidence on which to base a reasonable royalty rate, but that the evidence provided limited guidance. The Court cannot definitively conclude that there was insufficient evidence on which a reasonable jury could have reached the 0.5% royalty rate stated in the verdict form and as such Microsoft's motion for judgment as a matter of law on this ground is **DENIED**. However, the Court **GRANTS** Microsoft's motion for a new trial. The Court finds that the jury's verdict was against the clear weight of the evidence; although a plethora of licensing agreements were admitted into evidence, the majority of these which advocated a royalty rate in the 0.5% range lacked sufficient relevance to the technology at issue here, the relevant date of the hypothetical negotiation and/or the scope of a license that would be negotiated between these parties. Moreover, since the royalty base must be redetermined, the royalty rate dependent thereon also should be reconsidered.

### C.    Inconsistency of the Verdict

The jury awarded $769 million for infringement on each patent. According to the Special Verdict Form, it used a 0.5% royalty rate. Microsoft argues that the jury verdict is inconsistent with the evidence presented at trial: If the average selling price of the computer is $1128 (see PX3134), a 0.5% royalty would yield $5.64 per computer. Applied to the 130.5 million units sold with the HQ encoder, the total should be approximately $736 million for the '457 patent; applied to the 272 million infringing units for the '080 patent. yields $1.53 billion for this patent. (See DX6099.) Adding the damages for the two patents could have yielded a jury verdict of $2.269 billion.

The jury was not required to report on the verdict form the number of infringing units it took into consideration in its calculations. Moreover, whether the jury followed Microsoft's logic or chose to arrive at a reasonable royalty based on other factors and/or adjustments to this simple calculation is unknown. A plethora of payments and sums related to other licenses was in evidence in addition to the summary slides of the parties' damages models. Absent a view into the "black-box" of the jury's decision making

1    process, the Court cannot say that the jury's verdict was inconsistent or without the support

2    of sufficient evidence. Moreover, while it might be permissible in some circumstances to

3    rationalize the damages verdict such that adjustments by the Court could be made, the other

4    issues affecting the damages verdict here make this consideration moot. Therefore, the

5    Court **DENIES** Microsoft's motions for judgment as a matter of law and for a new trial on

6    this ground.

7    **D.    Impact of the Supreme Court's Ruling in <u>Microsoft Corp. v. AT & T<br/>Corp.</u>**

8    Microsoft argues that the $1.53 billion damages includes foreign sales which is

9    inconsistent with the very recent decision in <u>Microsoft Corp. v. AT & T Corp.</u>, 127 S. Ct.

10   1746, 1750 (2007), regarding the inapplicability of § 271(f) to software sent overseas on a

11   master disc (or electronically) for reproduction and sale because foreign sales of Windows

12   Media Player were included in the damages verdict here.

13   In <u>AT&T</u>, the Supreme Court held that "a copy of Windows, not Windows in the

14   abstract, qualifies as a 'component' under § 271(f)." <u>Id.</u> at 1756. It also held that

15   "components" under § 271(f) did not include copies of software installed on computers

16   where the copies themselves were not supplied from the United States. <u>Id.</u> at 1757.

17   In the instant case, the Special Verdict Form did not separately list damages for U.S.

18   and foreign sales. Additionally problematic, the damages covered infringement of both

19   apparatus and methods claims of the '457 and '080 patents.[21] <u>AT&T</u> expressly limited its

20   holding to apparatus claims:

21       We need not address whether software in the abstract, or any other intangible, can
22       ever be a component under § 271(f). If an intangible method or process, for instance,
         qualifies as a "patented invention" under § 271(f) (a question as to which we express
23       no opinion), the combinable components of that invention might be intangible as
         well. The invention before us, however, AT & T's speech-processing computer, is a
24       tangible thing.

25

26

_____

27   [21] The '457 patent and the '080 patent each had three claims at issue; of the total six claims,
     four were methods claims.

28                                39

Id. at 1756 n.13. Even if this Court declines to consider here whether <u>AT&T</u> should be extended to apply to the methods claims and applies the holding to the apparatus claims, the problem is not solved. The lack of transparency as to how the jury arrived at the numbers for its damages verdict makes any attempt at "subtracting out" foreign sales nearly impossible. Moreover, the parties have not pointed to any evidence that separated damages calculated for infringing methods claims versus apparatus claims of the patents. Hence, the Court has no guidance as to how even the damages for the foreign sales related to only apparatus claims could be removed.

The Court, however, need not and does not address this mountain of difficulties given the insufficient evidence to support the damages verdict as it stands now, *i.e.*, the inapplicability of the entire market value rule to the computer as the royalty base. Once the reasonable royalty base and rate are properly addressed, these remaining challenges can be rectified in the presentation of the evidence, jury instructions and a new verdict form in the new trial. The Court therefore defers the consideration on the impact of <u>AT&T</u> on the damages award until such time. Therefore, Microsoft's motions for judgment as a matter of law and for a new trial on this issue are **DENIED AS MOOT**.

### E.    Passion and Prejudice

Microsoft next argues that the $1.53 billion damages award was driven by the jury's passion and prejudice against Microsoft as a high earning large company. Microsoft points to statements made by Lucent in its closing argument referring to Microsoft's "80% plus profit" and references to revenue from computer sales of $38-$61 billion (when Microsoft did not even sell the computers). Microsoft also argues that the inclusion of foreign sales interjected prejudice into the damages calculation. It contends that Lucent's argument to the jury that Microsoft distributed millions of copies of the software around the world and made billions of dollars biased the jury and improperly inflated considerations under

40

Georgia Pacific.[22]

Microsoft's contentions are pure speculation. Other than isolated statements made in Lucent's opening and closing statements, there is no evidence that would suggest that the verdict was inflated by passion or prejudice. Simply the large number of units sold, the lack of royalty evidence other than something in the 0.5-1% range, and the use of the computer as the base price provides a possible reasoning for the jury's damages verdict. The Court cannot say that passion and prejudice necessarily played any role in reaching the amount of damages, rather than the jury's simple acceptance of Lucent's sums at face-value. On this ground, Microsoft's motion for a new trial is **DENIED**.

**VIII. CONCLUSION**

For the reasons herein, the Court rules as follows on Microsoft's grounds for judgment as a matter of law and/or new trial:

**Liability on the '457 Patent**

| | |
|---|---|
| No direct infringement | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| No indirect infringement | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |

**Ownership of the '080 Patent**

| | |
|---|---|
| Claims 2 and 4 are New Work | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| Fraunhofer is a co-owner<br>of the '080 patent | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| Lucent lacks standing | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |
| Microsoft's license defense | GRANTED judgment as a matter of law<br>Alternatively, GRANTED new trial |

---

[22] The record does not indicate that Microsoft objected to any of these statements during trial.

**Liability on the '080 Patent**

Incorrect claim construction                          DENIED as to new trial*[23]

No direct infringement                               DENIED as to judgment as a matter of law
                                                     and new trial

No contributory infringement                         DENIED as to judgment as a matter of law
                                                     and new trial

No inducing Infringement                             GRANTED judgment as a matter of law
                                                     Alternatively, GRANTED new trial

**Invalidity**

Obviousness -Impact of KSR                           DENIED as to judgment as a matter of law
                                                     and new trial

Anticipation - OCF paper                             DENIED as to judgment as a matter of law
                                                     and new trial

Anticipation - low bit rate paper                    DENIED as to judgment as a matter of law
                                                     and new trial

Exclusion of Johnston's testimony                    DENIED as to new trial*

Exclusion of deposition testimony                    DENIED as to new trial*
of Restaino and deVilliers

**Damages**

Royalty base - entire market value                   GRANTED judgment as a matter of law,
                                                     GRANTED new trial

Royalty rate                                         DENIED as to judgment as a matter of
                                                     law, GRANTED new trial

Inconsistent verdict                                 DENIED as to judgment as a matter of law
                                                     and new trial

Impact of AT&T                                       DENIED AS MOOT

Passion/prejudice                                    DENIED as to new trial*

//
//

---

[23] Microsoft moved only for new trial and not judgment as a matter of law on those issues
marked with an asterisk (*).

42

The net result of the rulings above results in a judgment under Fed. R. Civ. P. 54(b) in favor of Microsoft and against Lucent with costs to Microsoft, terminating the case as it pertains to these two patents, U.S. Patent Nos. 5,341,457 and RE 39,080..

In light of these rulings, Lucent's motion to amend or alter the judgement under Fed. R. Civ. P. 59(e) regarding supplemental damages, prejudgment and post judgment interest, and a permanent injunction is **DENIED AS MOOT** since Lucent is no longer the prevailing party.

**IT IS SO ORDERED.**

DATED:  August 6, 2007

Hon. Rudi M. Brewster
United States Senior District Court Judge

cc: Hon. Cathy Ann Bencivengo
      United States Magistrate Judge

      All Counsel of Record

43