# EXHIBIT H

1   Alison P. Adema, SBN 149285
    HAHN & ADEMA
2   501 West Broadway, Suite 1600
    San Diego, California 92101-3595
3   Telephone:    (619) 235-2100
    Facsimile:    (619) 235-2101
4
5   *Attorneys for Lucent Technologies Inc.*
6   *Additional counsel listed on the last page*
7
8
9               **UNITED STATES DISTRICT COURT**
10              **SOUTHERN DISTRICT OF CALIFORNIA**
11  LUCENT TECHNOLOGIES INC.,
12              Plaintiff,                    Case No. 02-CV-2060 B (CAB)
                                              consolidated with
        v.                                    Case No. 03-CV-0699 B (CAB)
13                                            Case No. 03-CV-1108 B (CAB)
    GATEWAY, INC., GATEWAY COUNTRY
14  STORES LLC, GATEWAY COMPANIES,
    INC., GATEWAY MANUFACTURING LLC          **LUCENT'S OPPOSITION TO**
15  and COWABUNGA ENTERPRISES, INC.,         **MICROSOFT'S MOTION FOR**
                                              **JUDGMENT AS A MATTER OF LAW**
16              Defendants,                   **ON THE GROUP 2 AUDIO PATENTS**
        and
17                                            Date:         July 25, 2007
    MICROSOFT CORPORATION,                    Time:         9:00 A.M.
18                                            Courtroom:    2
                Intervener.                   Judge:        Hon. Rudi M. Brewster
19  
    MICROSOFT CORPORATION,
20  
                Plaintiff,
21  
        v.
22  
    LUCENT TECHNOLOGIES INC.,
23  
                Defendant.
24  LUCENT TECHNOLOGIES INC.,
25              Plaintiff,
26      v.
27  DELL INC.,
                Defendant.
28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................1

II.     LEGAL STANDARD...........................................................................................1

III.    ARGUMENT .......................................................................................................1

    A.    Lucent Presented Substantial Evidence From Which The Jury Reasonably
        Concluded That WMP-10 Infringes The Asserted Claims Of The '457 Patent. ...........1

        1.    Substantial Evidence Supports The Jury's Infringement Verdict......................2

        2.    Lucent Was Not Required To Provide Eyewitness Accounts Of The
                HQ Encoder In Operation. .................................................................................4

        3.    Lucent Did Not Rely On Speculation. ...............................................................6

        4.    The Jury Was Entitled To Conclude That Windows Media Player 10
                Infringes Claim 10 Of The '457 Patent...............................................................7

        5.    Lucent Introduced Substantial Evidence That Microsoft Induced And
                Contributed To The Infringement Of The '457 Patent. ......................................8

    B.    The Jury Reasonably Found That The Claims Of The '938 Patent Do Not
        Embody "New Work.".................................................................................................10

        1.    Microsoft Failed To Meet Its Burden Of Proof At Trial And Now
                Ignores That Burden In Seeking JMOL...........................................................11

        2.    The Jury Reasonably Concluded That Microsoft Failed To Prove That
                Claims 1 and 3 Incorporate Work Performed After April 1989. ......................11

        3.    The Jury Reasonably Concluded That Microsoft Failed To Prove That
                Claim 4 Incorporates Work Performed After April 1989...............................12

        4.    The Jury Reasonably Concluded That Microsoft Failed To Prove That
                Claim 2 Incorporates Work Performed After April 1989...............................14

    C.    Even If A Subset Of The '938 Patent Claims Embody "New Work,"
        Amendment Of This Court's March 19, 2007 Findings Would Not Be
        Warranted...................................................................................................................15

    D.    The Jury's Damages Verdict Is Supported By Substantial Evidence And Is
        Otherwise Proper. .....................................................................................................17

    E.    The Jury's Damages Verdict Is Wholly Consistent With The Evidence
        Presented By Lucent At Trial And Is Not Facially Inconsistent. ...............................17

F.    The *AT&T* Decision Does Not Render The Jury's Verdict Incorrect, And Does Not Operate To Set Aside The Verdict..........................................................18

G.    Substantial Evidence Supports The Jury's Verdict Of Nonobviousness. ....................20

H.    The Jury Reasonably Found That Microsoft Failed To Prove That Claim 4 Of The '080 Patent Is Invalid Over The 1987 OCF Paper.................................................21

I.    The Jury Reasonably Found That Microsoft Failed To Prove That The Low Bit Rate Paper Anticipates The Asserted Claims Of The '080 Patent.............................22

J.    Lucent Presented Substantial Evidence From Which The Jury Could Reasonably Conclude That The Accused Products Infringe The Johnston '080 Patent..........................................................................................................................24

K.    Lucent Presented Substantial Evidence From Which The Jury Could Reasonably Conclude That Microsoft Induced And Contributed To The Infringement Of The Patents-In-Suit Through The CyberLink Encoder....................25

IV.    CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Thermoplastics Co. v. Faytex Corp.*,
    974 F.2d 1279 (Fed. Cir. 1992)..............................................................8

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*,
    55 F.3d 615 (Fed. Cir. 1995)..................................................................5

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006)..........................................................9, 25

*Dynamics v. Vaughan Co.*,
    449 F.3d 1209 (Fed. Cir. 2006)..............................................................4

*E-Pass Technologies v. 3Com Corp.*,
    473 F.3d 1213 (Fed. Cir. 2007)..............................................................5

*Hoechst-Roussel Pharms., Inc. v. Lehman*,
    109 F.3d 756 (Fed. Cir. 1997)..............................................................16

*Intel Corp. v. United States Int'l Trade Comm'n*,
    946 F.2d 821 (Fed. Cir. 1991)................................................................7

*Johnson v. Paradise Valley Unified Sch. Dist.*,
    251 F.3d 1222 (9th Cir. 2001)................................................................1

*Kotio Mfg. Co. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004)............................................................21

*Lampi Corp. v. Am. Power Prods., Inc.*,
    228 F.3d 1365 (Fed. Cir. 2000)............................................................14

*Lucent Technologies Inc., v. Newbridge Networks Corp.*,
    168 F. Supp. 2d 181 (D. Del. 2001)........................................................4

*Manville Sales Corp. v. Paramount Sys., Inc.*,
    917 F.2d 544 (Fed. Cir. 1990)................................................................9

*Mendenhall v. Astec Indus., Inc.*,
    14 U.S.P.Q.2d 1140 (Fed. Cir. 1989)......................................................5

*Microsoft Corp. v. AT&T Corp.*,
    127 S. Ct. 1746 (2007)........................................................................18

*Pavao v. Pagay*,
    307 F.3d 915 (9th Cir. 2002) ............................................................1, 11

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................16

## TABLE OF AUTHORITIES
### (continued)

Page

*Pope Mfg. Co. v. Gormully & Jeffery Mfg. Co.,*
    144 U.S. 248 (1982)................................................................................................16

*Thomson, S.A. v. Quixote Corp.,*
    166 F.3d 1172 (Fed. Cir. 1999).............................................................................23

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,*
    425 F.3d 1366 (Fed. Cir. 2005).........................................................................18, 19

**Statutes and Rules**

35 U.S.C. § 112...................................................................................................................13

35 U.S.C. § 271(f)........................................................................................................18, 19

35 U.S.C. § 284...................................................................................................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   INTRODUCTION

Following a three-week trial, and days of careful deliberation, the jury in this case returned a well-founded verdict holding Microsoft liable for infringing Lucent's audio-coding patents and awarding appropriate damages. Microsoft now asks this Court to set aside that verdict because it does not like the result. But because the jury verdict is fully supported by the trial record, no basis for judgment as a matter of law exists. Simply put, this case was fairly tried and Microsoft lost. Microsoft's motions for JMOL should be denied.

# II.   LEGAL STANDARD

A trial court plays a "limited role in reviewing a jury's factual findings." *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). "A jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay,* 307 F.3d 915, 918 (9th Cir. 2002). "[A]lthough the court should review the record as a whole, it must disregard evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury." *Id.* (quoting *Paradise Valley*, 251 F.3d at 1227) (alterations in original). "That there was also evidence favorable to the [moving party is] simply not relevant, since the jury was free to disbelieve, and therefore to disregard, that evidence." *Paradise Valley*, 251 F.3d at 1227. Accordingly, a court may only grant judgment as a matter of law "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao*, 307 F.3d at 918.

# III.   ARGUMENT

## A.   Lucent Presented Substantial Evidence From Which The Jury Reasonably Concluded That WMP-10 Infringes The Asserted Claims Of The '457 Patent.

After years of litigation and months of trial preparation, Microsoft chose to present to the jury a single theory of noninfringement concerning the '457 patent: that the High Quality encoder ("HQ encoder") included in every copy of Windows Media Player 10 ("WMP-10") is never invoked in

1    practice. (*See, e.g.*, 2/8/07 Tr. at 146:7-17)[1]  Having staked its entire defense on a theory of nonuse

2    — without any technical defense to non-infringement — Microsoft now asks this Court to throw

3    away the jury's verdict, credit Microsoft's evidence over Lucent's, and find as a matter of law that

4    WMP-10's HQ encoder is never used in practice.  But because the jury's finding that WMP-10

5    infringes the '457 patent is supported by substantial evidence, Microsoft's arguments provide no

6    basis for overturning the jury's verdict.

7                    **1.    Substantial Evidence Supports The Jury's Infringement Verdict.**

8              At trial Lucent presented substantial evidence that the HQ encoder is used by WMP-10

9    customers.  For example, Lucent's expert, Dr. Polish, testified that the HQ encoder is compiled and

10   included in every copy of WMP-10 and that the HQ encoder is called when the Fast encoder fails.

11   (1/31/07 Tr. at 138:12-15, 139:2-16)  Polish explained that the Fast encoder will fail for numerous

12   reasons and identified four specific errors that will cause the Fast encoder to fail.  (1/31/07 Tr. at

13   141:25-142:10)  Such "memory allocation errors" occur when the software concludes that it is unable

14   to assign memory resources, either temporarily or permanently.   (1/31/07 Tr. at 144:5-145:20)

15   Polish explained that memory allocation errors are common in complex run-time environments like

16   Windows.  (*See* 1/31/07 Tr. at 145:21-146:9, 148:10-19; 2/13/07 Tr. at 50:15-56:15)   Moreover,

17   Polish testified these memory allocation errors ***do*** occur routinely in practice, so that customers using

18   WMP-10 ***do*** in fact use the HQ encoder. (2/13/07 Tr. at 46:7-10, 56:16-57:11)

19             Along with Polish's source code analysis, Lucent introduced additional evidence from which

20   a reasonable jury could conclude that the HQ encoder is invoked in practice.  For example, Lucent

21   introduced Microsoft's own e-mails demonstrating that Microsoft inquired how to disable the HQ

22   encoder, was told how to do so by Fraunhofer, and yet chose ***not*** to disable the HQ encoder.  (1/31/07

23   Tr. at 149:7-151:19; DTX 7050)  Lucent also presented another Fraunhofer e-mail explaining to

24

25

26   _____

       [1]   All citations to the trial transcript, Plaintiff's Exhibits ("PXs"), Defendants Exhibits ("DXs"),
27   and Miscellaneous Exhibits ("MXs") refer to materials contained in the Appendix of Exhibits in
       Support of Lucent's Oppositions to Microsoft's Post-Trial Motions on the Group 2 Patents, filed
28   concurrently herewith.

1  Microsoft that known bugs existed in the MP3 code of the type that could cause the memory

2  allocation errors described by Polish.   (1/31/07 Tr. at 151:20:152-16; DTX 7051)  Such evidence

3  more than sufficed for the jury to conclude reasonably that customers use the HQ encoder in practice.

4  Nevertheless, relying entirely on its own expert's testimony, Microsoft boldly asserts that it

5  "conclusively demonstrated that the HQ encoder is inaccessible." (Microsoft Br. at 3)  But Lucent

6  offered ample contradictory evidence that the HQ encoder is invoked, and the resulting factual

7  dispute alone defeats Microsoft's motion for judgment as a matter of law.

8  Moreover, Polish directly rebutted the testimony on which Microsoft relies, including Dr.

9  Strawn's testimony that allegedly "demonstrated that if the PConfig variable prevents operation of

10  the Fast encoder, it will also prevent operation of the HQ encoder." (Microsoft Br. at 3)  Polish

11  explained that Strawn focused on the wrong memory contents, and reaffirmed his earlier testimony

12  that PConfig errors will occur and cause the HQ encoder to be invoked. (2/13/07 Tr. at 44:8-47:6)

13  Likewise, Polish rebutted Strawn's testimony that the "HQ encoder runs all of the same initialization

14  routines as the Fast encoder." (Microsoft Br. at 3; 1/31/07 Tr. at 146:17-147:9)

15  Strawn's argument that if the Fast encoder fails, the HQ encoder will fail also conflicted with

16  substantial contrary evidence, including Polish's testimony and Microsoft's own documents.

17  (Microsoft Br. at 3)  During his direct examination, Strawn asserted that the HQ encoder uses more

18  memory than the Fast encoder, so memory allocation errors that cause the Fast encoder to fail will

19  necessarily force the HQ encoder to fail. (*See* 2/7/07 Tr. at 109:5-110:1, 128:13-131:24)  But Strawn

20  focused only on a situation where a computer is completely out of memory.  (*Id.*)  As Polish

21  explained, many other common circumstances cause memory allocation errors. (2/7/07 Tr. at 47:18-

22  48:9)  For example, Polish explained that memory allocation errors commonly occur through the

23  simultaneous operation of various computer programs. (2/7/07 Tr. at 48:10-50:14)

24  Moreover, Strawn's testimony that memory allocation errors are rare was rebutted by an

25  article published on Microsoft's own developer website:

26  As with return value checking, many people believe that memory allocation issues
   ***never occur in practice***.  Granted, it does not happen all the time, but that does not
27  mean it never happens. ***If you have thousands or millions or people running your***
   ***software, even if it happens just once a month for each user, the result is significant.***
28

(2/13/07 Tr. at 55:21-56:2 (emphasis added))  The article also corroborated Polish's testimony that memory allocation errors are common and occur when programs run simultaneously on a computer:

> The specific category of unusual events covered in this article is error cases. Intuitively, it means that something that normally succeeds does not. ***Memory allocation errors are a classic example. Most of the time there is plenty of memory to go around, but occasionally a machine may be particularly busy running huge spreadsheet calculation*** or, in an internet world, because somebody is launching a denial of service attack on the machine. ***If you are writing any kind of significant component, service or application, you need to anticipate this type of situation***.

(*Id.* at 55:3-14)  The jury was entitled to credit Polish's testimony and Microsoft's own e-mails and articles over the testimony of Microsoft's expert.  Because Lucent introduced substantial evidence that the HQ encoder was used in practice, Microsoft's motion for judgment as a matter of law should be denied.

## 2.    Lucent Was Not Required To Provide Eyewitness Accounts Of The HQ Encoder In Operation.

Despite compelling evidence that the HQ encoder is used in practice by Microsoft's customers, Microsoft argues that Lucent was required to present direct evidence of a particular instance in which the HQ encoder was invoked.  (Microsoft Br. at 3)  But the Federal Circuit has repeatedly emphasized that "[t]here is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable *per se*." *Liquid Dynamics v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006) (citing *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1374 (Fed. Cir. 2005)).  Indeed, in *Lucent Technologies Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 208-09 (D. Del. 2001), another district court applied this rule in practice, holding that "the Court will not require [the patentee] to introduce direct evidence of the final resting place of each item sold by [the accused infringer], where and how it is used, or whether it is employed in an infringing manner on Monday through Thursday, but not in the remainder of the week." *Id.* at 208.  Likewise, Lucent need not show here a particular instance in

1   which the HQ encoder is invoked, but rather can rely on evidence from which the jury may infer that

2   it was invoked in practice.[2]

3       Microsoft attempts to distinguish *Newbridge* as concerning a case where "normal use of the

4   accused product could reasonably be expected to result in infringement." (Microsoft Br. at 5)  But

5   this case is no different, as Dr. Polish testified that during normal use of WMP-10, the HQ encoder

6   will be invoked as a backup when the Fast encoder fails.  Indeed, the Federal Circuit has already

7   found that where an accused product is capable of implementing the patented method and evidence

8   exists that under certain circumstances the method could be practiced, a jury may conclude that the

9   method was in fact performed.  *Mendenhall v. Astec Indus., Inc.*, 14 U.S.P.Q.2d 1140, 1142 (Fed. Cir.

10   1989) ("That a patented method includes steps that are designed as a safety feature and are therefore

11   performed only occasionally when certain conditions arise, does not preclude a finding that the sale

12   of an apparatus that includes this feature infringes the method patent . . ."); *see also Bell Commc'ns*

13   *Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) ("[I]t should be

14   noted that any future infringement analysis respecting the assigning step should be undertaken with

15   due attention to the principle that an accused product that sometimes, but not always, embodies a

16   claimed method nonetheless infringes.").

17       Finally, Microsoft's reliance on *E-Pass Technologies v. 3Com Corp.*, 473 F.3d 1213 (Fed.

18   Cir. 2007), is misplaced. (Microsoft Br. at 5)  The method claim at issue in *E-Pass* required that each

19   step of the method be performed in a specific order, but the accused infringer never provided its

20   customers with instructions on how to perform the steps in that order.  *Id.* at 1222 ("Nowhere do the

21   manual excerpts teach all of the steps of the claimed method together, much less in the required

22   order.  Accordingly, it requires too speculative a leap to conclude that any customer actually

---

25   [2] Microsoft claims that "even Dr. Polish had to admit that he had never made the HQ encoder
    work under any of those alleged error conditions (or any other conditions) — not even once."

26   (Microsoft Br. at 3-4)  But Polish merely stated that there was no way to know whether the HQ
    encoder was actually being run at any particular time.  This is not surprising since it is impossible

27   to tell from direct observation alone whether the Fast or HQ encoder is running.  (1/31/07 Tr. at
    200:21-201:8)

1  performed the claimed method."). Absent such instructions, there was no reason to expect customers

2  to practice the steps in the required order through normal use of the product. Here, however, the

3  record was replete with evidence that the HQ encoder will be invoked as a result of common

4  conditions that occur routinely in practice. Moreover, there was no dispute that the HQ encoder

5  performs each limitation of the claimed method each time it is invoked.

6  ### 3.    Lucent Did Not Rely On Speculation.

7  Ignoring Dr. Polish's analysis of Microsoft's source code, Microsoft's e-mails regarding the

8  HQ encoder, and Microsoft's website demonstrating that memory allocation errors routinely occur in

9  practice, Microsoft argues that "Lucent blindly speculated that the HQ Encoder must be present for

10  some purpose." (Microsoft Br. at 6)  To the contrary, the evidence presented by Lucent firmly

11  established the backup nature of the HQ Encoder and the conditions under which it runs. (*See*

12  Section III.A.1, *supra*)  The presence of the HQ encoder in every copy of WMP-10 buttresses the

13  testimonial and documentary evidence of its use.

14  Nevertheless, Microsoft presents a rambling argument that purportedly explains why the HQ

15  encoder was really included in WMP-10. (Microsoft Br. at 6)  But none of Microsoft's allegedly

16  "unrefuted" explanations offer any insight as to why the HQ encoder is included in WMP-10, if not

17  to serve as a backup. For example, Microsoft asserts that it developed part of the backup code before

18  it received the Fast and HQ encoders from Fraunhofer, and thus it had nothing to do with choosing

19  the HQ encoder as a backup. (Microsoft Br. at 6)  But even if true, this "evidence" does not explain

20  why the HQ encoder is included in WMP-10. Instead, it merely demonstrates that Microsoft intended

21  one encoder to serve as the primary encoder and another to serve as the backup, without specifying

22  the particular encoders. Moreover, it directly contradicts Microsoft's second purported explanation

23  for the HQ encoder — that Microsoft actually wanted customers to use the Fast encoder. (Microsoft

24  Br. at 6)  If Microsoft did not choose the HQ encoder as a backup, then it certainly did not choose the

25  Fast encoder as the default. And whichever story Microsoft chooses, the jury was entitled to

26  conclude that neither one explains away the HQ encoder.

27  Finally, Microsoft argues that it removed the HQ encoder from Windows Media Player.

28  (Microsoft Br. at 7)  Again, this misses the point: this alleged evidence says nothing about why the

HQ encoder was included in WMP-10 in the first place. Indeed, coupled with Dr. Polish's analysis of the source code and the documentary evidence produced by Microsoft, the jury was entitled to conclude that the HQ encoder was intended to be used as a backup when the Fast encoder failed. Thus, because Lucent presented substantial evidence that the HQ encoder is used in practice, Microsoft's motion for judgment as a matter of law should be denied.

**4.    The Jury Was Entitled To Conclude That WMP-10 Infringes Claim 10 Of The '457 Patent.**

Microsoft does not dispute that the HQ encoder that shipped with WMP-10 was designed to perform each and every step of method claims 1 and 5 of the '457 patent, but rather argues that the HQ encoder is not used by customers in practice. As demonstrated above, however, the jury properly rejected Microsoft's allegation and reasonably concluded based on the evidence that Microsoft's customers do use the HQ encoder.

Furthermore, while Microsoft at least attempted — albeit unsuccessfully — to rebut Lucent's infringement proof concerning claims 1 and 5, it now concedes that it presented no noninfringement defense concerning apparatus claim 10 of the '457 patent. Black letter patent law establishes — and Microsoft does not dispute — that a product infringes an apparatus claim if it is *capable of* operating in an infringing manner. *Intel Corp. v. United States Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991). Because Microsoft did not challenge Lucent's evidence that the HQ Encoder that ships with each and every copy of WMP-10 is capable of performing each of the steps in claim 10, the jury correctly found infringement of that claim.

Microsoft notes that unlike a typical apparatus claim, which merely recites structural components, a product-by-process claim such as claim 10 also includes process limitations that must be considered in performing the infringement analysis. But this facet of product-by-process claims does not rescue Microsoft from the jury's verdict, as Lucent demonstrated that the HQ encoder meets all of the process limitations of claim 10.

Claim 10 is directed to a "storage medium," such as the hard drive of a computer, that is "manufactured in accordance with" several process steps. (PX 1 at 16:28-57) Thus, as this Court has already recognized, claim 10 requires that the accused product include a storage medium and that it

1    be programmed to perform each of the process steps recited in the claim. (MX 9 at 226:14-16)

2    Because Microsoft does not dispute a computer with WMP-10 (which includes the HQ encoder)

3    incorporates a storage medium — *e.g.,* a hard drive — or that the HQ encoder meets each step of

4    claim 10, the jury came to the only possible conclusion: WMP-10 infringes claim 10 of the '457

5    patent.

6           Seeking to narrow the unambiguous claim language, Microsoft argues that process steps must

7    be ***performed*** to infringe a product-by-process claim. (Microsoft Br. at 7-8) On that basis, Microsoft

8    also contends that Jury Instruction 33 is wrong as a matter of law because it does not include an

9    "actual performance" requirement. (*Id.* at 8) But Microsoft cites no authority in support of its

10   theory. Indeed, the only case cited by Microsoft — *Atlantic Thermoplastics Co. v. Faytex Corp.*, 974

11   F.2d 1279 (Fed. Cir. 1992) — merely stands for the unremarkable proposition that "process terms in

12   product-by-process claims serve as limitations in determining infringement." *Id.* at 1279. But neither

13   party is urging the Court to ignore the process steps of claim 10. To the contrary, as Lucent's expert

14   explained, a computer with the HQ encoder that is included in every copy of WMP-10 contains a

15   storage medium and the instructions to perform each and every process step of claim 10. (1/30/07 Tr.

16   at 140:15-141:6, 204:4-213:23, 224:19-228:3, 238:1-18) Microsoft did not even attempt to rebut this

17   testimony. Accordingly, the record contains substantial evidence from which the jury could

18   reasonably conclude that WMP-10 infringes claim 10 of the '457 patent.

19                  **5.      Lucent Introduced Substantial Evidence That Microsoft Induced And**
                             **Contributed To The Infringement Of The '457 Patent.**
20
21          In two sentences, Microsoft simply asserts that despite the jury's verdict to the contrary,

22   Lucent failed to prove that Microsoft induced or contributed to the infringement of the '457 patent.

23   (Microsoft Br. at 8) Neither assertion withstands scrutiny. First, as explained in more detail in

24   Section III.G of Lucent's Opposition to Microsoft's Motion for a New Trial, although Microsoft

25   bundles several types of audio codecs in its Windows Media Player products, the evidence

26   demonstrated that the HQ encoder can only be used in an infringing manner. Moreover, the HQ

27   encoder cannot remotely be considered a staple article. Thus, the jury reasonably concluded that the

28

1   HQ encoder was "not a staple article suitable for substantial non-infringing use" and that Microsoft

2   therefore contributed to the infringement of the '457 patent.

3    Second, Microsoft's suggestion that "Lucent failed to prove the specific intent required for

4   inducement" is not supported by the evidence. (Microsoft Br. at 8) Sitting *en banc*, the Federal

5   Circuit recently clarified the standard for specific intent to induce infringement, holding that "[t]he

6   plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and

7   that *he knew or should have known* his actions would induce actual infringements.'" *DSU Med.*

8   *Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006) (quoting *Manville Sales Corp. v. Paramount*

9   *Sys., Inc.*, 917 F.2d 544, 554 (Fed. Cir. 1990)) (internal quotations omitted) (emphasis added).

10   Accordingly, the Court properly instructed the jury that Lucent had the burden of proving four

11   elements of inducement:

12    Number one, Microsoft intended to encourage, instruct, or aid a person in the acts
 which infringe 457 or 080 patents. Two, at the time of the encouragement, instruction,

13    or aid, Microsoft knew of the 457 or 080 patents. Three, *Microsoft knew or should*
 *have known that its encouragement, instruction, or aid to the person would cause*

14    *the direct infringement of the 457 or the 080 patents.* And, four, the person infringed

15    the 457 or the 080 patents.

16   (2/14/07 Tr. at 214:4-17).

17    At trial, Lucent presented substantial evidence on each prong of the inducement test,

18   demonstrating to the jury that Microsoft both knew of the '457 patent at the time it began shipping

19   WMP-10 and provided instruction and encouragement to WMP-10 users to perform the infringing act

20   of encoding MP3 files. (1/30/07 Tr. at 242:8-248:17; 1/31/07 Tr. at 5:8-8:25; 2/1/07 Tr. at 9:24-

21   10:10, 11:2-5, 48:13-49:17, 51:5-13, 54:6-57:7; PX 79; PX 140; PX 142; PX 1404; PX 1832; PX

22   1843; PX 1872; PX 1873; PX 3037) Moreover, Microsoft knew that Lucent had accused WMP-10 of

23   infringing the '457 patent, asked Fraunhofer how to turn off the HQ encoder as a backup — yet chose

24   not to — and concluded that the HQ encoder met every limitation of the asserted claims, providing

25   ample evidence from which the jury could have reasonably concluded that Microsoft knew, or at least

26   should have known, that its customers were infringing the '457 patent. (1/31/07 Tr. at 150:23-

27   151:19; 2/2/07 Tr. at 239:9-243:17; PX 36; DX 7050.) Microsoft's litigation-contrived allegations

28   that it wanted customers to use the Fast encoder, knew the HQ encoder did not work, and removed

the HQ encoder before it was accused of infringement (Microsoft Br. at 6-7), are simply unsupported by the evidence presented at trial. Because Lucent presented substantial evidence of indirect infringement, Microsoft's motion for judgment as a matter of law should be denied.

**B.** **The Jury Reasonably Found That The Claims Of The '938 Patent Do Not Embody "New Work."**

Microsoft asks this Court to discard the jury's verdict that the claims of the '938 patent, which reissued as the '080 patent, embody no work first performed in or after April 1989. In so doing, Microsoft ignores its burden of proof both at trial and on this motion for JMOL. Applying the correct standard to the pertinent question, Microsoft's JMOL motion must be denied because a reasonable jury could readily conclude — as this jury did — that Microsoft failed to prove any claim of the '938 patent incorporates work first performed in or after April 1989.

By way of background, the 1989 Joint Development Agreement between AT&T and Fraunhofer ("the JDA") distinguishes between "New Work" and "Existing Technology." (DX 6489 at 1-2) The JDA defines "New Work" as work relating to digital audio coding performed during a specified period by certain AT&T and Fraunhofer personnel. (*Id.* at 1-2) The specified period began upon Dr. Karlheinz Brandenburg's arrival at AT&T in late April 1989. (*Id.* at 1-2; 2/5/07 Tr. at 211:2-4) The JDA defines "Existing Technology" as the result of work relating to digital audio coding performed before the specified period. (*Id.* at 2) The JDA further provides several non-exclusive examples of specific "Existing AT&T Technology." (*Id.* at 2, 7-8) Those examples include the original 1988 application that led to the '457, '938, and '080 patents, as well a several publications by '080 patent inventor James D. Johnston. (*Id.*)

At trial, Microsoft argued that the claims of the '938 patent (and hence the '080 patent) constitute "New Work" because they allegedly embody work first performed in or after April 1989. According to Microsoft, Fraunhofer therefore co-owns the '080 patent, Microsoft has a license from Fraunhofer, and Lucent lacks standing to pursue this action. (Microsoft Br. at 14-15) The jury, however, rejected Microsoft's argument and found that Microsoft failed to prove any claim of the '938 patent incorporated work performed after April 1989. (MX 2 at 5) This Court accordingly

entered judgment that Lucent is the exclusive owner of the '080 patent, that Microsoft has no license to the '080 patent, and that Lucent has standing to pursue this case. (MX 1 at 4)

### 1. Microsoft Failed To Meet Its Burden Of Proof At Trial And Now Ignores That Burden In Seeking JMOL.

Microsoft bore the burden at trial of proving that the claims of the '938 patent incorporate work first performed in or after April 1989.[3]  Now, in seeking JMOL, Microsoft must demonstrate that "the evidence, construed in the light most favorable to [Lucent], permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).  Having failed to meet its burden of proof at trial, Microsoft now flouts both standards in its JMOL brief, erroneously contending that *Lucent* must prove that all subject matter claimed in the '938 patent is "Existing Work."   As explained below, however, Microsoft offered no actual proof that work incorporated in the '938 patent claims was first performed in or after April 1989, let alone such overwhelming proof that a reasonable jury could not find otherwise.  Microsoft's motion for JMOL should therefore be denied.

### 2. The Jury Reasonably Concluded That Microsoft Failed To Prove That Claims 1 and 3 Incorporate Work Performed After April 1989.

In a three-sentence footnote, Microsoft summarily contends — based solely on the testimony of its expert, Dr. Strawn — that claims 1 and 3 of the '938 patent incorporate work performed in or after April 1989. (Microsoft Br. at 14 n.10)  But even if it were uncontroverted, Strawn's testimony could not satisfy Microsoft's burden of proof because it does not address whether the work incorporated in those claims was first performed in or after April 1989.  Rather, Strawn merely

---

[3] Microsoft bears the burden of proving both that it has a license to the '080 patent and that Fraunhofer is a necessary party to this action whose absence deprives Lucent of standing. *See, e.g.*, *Shermoen v. United States*, 982 F.2d 1312, 1317 (9th Cir. 1992); *Spindelfabrik Suessen-Schurr v. Schubert & Salzer Maschinenfabrik AG*, 903 F.2d 1568, 1576 (Fed. Cir. 1990).  The verdict form therefore properly placed on Microsoft the burden of demonstrating that the claims of the '938 patent incorporate "New Work." (Special Verdict Form at 5 ("*Has Microsoft proven by a preponderance of the evidence* that work was performed on or after April 1989 which was incorporated in any of the claims of the '938 patent?") (emphasis added))

1　asserted that the specification of the original 1988 application does not clearly describe the "rate loop

2　processor" limitation of claims 1 and 3.  (2/7/07 Tr. at 208:4-10)

3　　　　In any event, overwhelming evidence contradicts that testimony.  Lucent's expert (Dr.

4　Jayant), one of Microsoft's experts (Dr. Brandenburg), the inventor of the '938 patent (Mr. Johnston),

5　and the coinventor of the '457 patent (Dr. Hall) all explained how the original 1988 application

6　discloses every limitation of '938 patent claims 1 and 3.  (2/13/07 Tr. at 95:11-96:9, 98:9-107:25;

7　2/6/07 Tr. at 156:13-20; 2/5/07 Tr. at 101:22-107:3; 1/30/07 Tr. at 55:17-56:25)  Indeed, Strawn

8　himself admitted that *every other witness* disagreed with him on that point.  (2/8/08 Tr. at 171:9-

9　173:9)  A reasonable jury could certainly side with the majority of witnesses over Strawn.  Because

10　Microsoft failed to prove that claims 1 and 3 of the '938 patent incorporate work first performed in or

11　after April 1989, Microsoft's motion for JMOL concerning those claims should be denied.

12　　　　　　　**3.　　The Jury Reasonably Concluded That Microsoft Failed To Prove That
Claim 4 Incorporates Work Performed After April 1989.**

13

14　　　　The record also fully supports the jury's finding that claim 4 of the '938 patent incorporates

15　no work first performed in or after April 1989.  Microsoft offered no evidence to meet its burden of

16　proving otherwise.  Nevertheless, Microsoft argues that claim 4 is "New Work" because the language

17　in the specification that this Court cited in defining corresponding structure for the means-plus

18　function limitations was added by amendment after April 1989.  (Microsoft Br. at 10-11)

19　　　　Microsoft is wrong.  The critical issue is when the work incorporated in claim 4 was first

20　performed, not when it was first included in a patent application.  Thus, although the inventors' work

21　must have been complete on or before the date of the amendment adding the language, that date does

22　***not*** indicate when the inventors first performed that work and therefore cannot prove that claim 4

23　embodies work first performed in or after April 1989.  Ultimately, Microsoft made no attempt to

24　introduce evidence, such as testimony from Johnston (or any other witness), to prove that the work

25　incorporated in claim 4 was first performed in or after April 1989.  Microsoft therefore failed to meet

26　its burden of demonstrating that claim 4 incorporates such work.

27　　　　Furthermore, the record contains ample evidence that long before April 1989, Johnson

28　performed work on the claimed decoder using the corresponding structure for claim 4 (*i.e.*, "a digital

1  signal processor (DSP), a DSP with software, VLSI hardware embodiments, or hybrid DSP/VLSI

2  embodiments"). For example, Lucent's technical expert, Dr. Jayant, identified specific portions of

3  the original 1988 specification that disclose such structures to a person skilled in the art.[4] (2/13/07

4  Tr. at 109:5-15, 110:1-18; PX 1 at 11:67-12:16, Fig. 7) He further explained that "by merely looking

5  at the [original 1988 application] alone at the time," a person skilled in the art would understand that

6  the claimed functions could be implemented using the corresponding structures identified by the

7  Court. (2/13/07 Tr. at 110:19-111:10) Because the original 1988 application teaches those

8  structures, and the JDA expressly identifies the teachings of the original 1988 application as

9  "Existing Work" (DX 6489 at 2, 8), the jury could and did reasonably conclude that the work

10  incorporated in claim 4 was performed before April 1989.[5]

11      Finally, Microsoft's contention that the original 1988 application fails to provide adequate

12  written description for claim 4 under 35 U.S.C. § 112 is both erroneous and irrelevant. Even if

13  written description for claim 4 were lacking in the original 1988 application, that circumstance would

14  not establish that the work reflected in claim 4 was first performed in or after April 1989.

15  Microsoft's written description argument therefore has no bearing on whether claim 4 incorporates

16  "New Work."

17      In any event, adequate written description does not — as Microsoft contends — require an

18  express, word-for-word recitation of corresponding structure in the original 1988 application. *Lampi*

---

[4] In so doing, Jayant in no way disregarded this Court's claim construction and identification of corresponding structure. Rather, Jayant simply opined that portions of the original 1988 application, as read by a person skilled in the art, disclose the corresponding structure identified by the Court. (2/13/07 Tr. at 109:5-15, 110:1-111:10)

[5] Moreover, the record also contains evidence from which the jury could reasonably infer that Johnston implemented the functions described in claim 4 using a DSP before April 1989. As both parties' experts explained, DSPs are simply chips that computers use to manipulate digital data. (1/30/07 Tr. at 185:9-23; 2/5/07 Tr. at 206:24-207:3) Microsoft's expert, Dr. Strawn, further explained that DSPs have been around since the early 1980s. (2/7/07 Tr. at 201:9-17) Johnston's own 1988 IEEE paper — which JDA expressly identifies as describing "Existing Technology" — confirms that Johnston's work used "digital signal processing hardware." (PX129 at 323; DX6489 at 2, 7) And Johnston even testified that he ran software implementing his PXFM codec — which performed all of the functionality of claim 4 — on a computer in 1987. (2/5/07 Tr. at 4:11-9:19, 96:3-99:25, 103:2-105:6; PX 128)

*Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1378 (Fed. Cir. 2000) ("In order to satisfy the written description requirement, the disclosure as originally filed need not provide *in haec verba* support for the claimed subject matter at issue."). Rather, "[t]he requirement is met if the disclosure of the application relied upon reasonably conveys to the artisan that the inventor had possession at that time of the later claimed subject matter." *Id.* Here, because Lucent introduced evidence that the original 1988 application discloses the corresponding structures identified by the Court to a person of ordinary skill in the art, a reasonable jury would be entitled to find that the original application provides sufficient written description for claim 4. (2/13/07 Tr. at 109:5-15, 110:1-111:10)

### 4. The Jury Reasonably Concluded That Microsoft Failed To Prove That Claim 2 Incorporates Work Performed After April 1989.

Microsoft's argument for JMOL that claim 2 of the '938 patent incorporates "New Work" suffers from the same flaws that undermine its argument concerning claim 4. Again, the fact that the inventors first filed claim 2 after April 1989 provides no proof that the claimed MDCT constitutes work first performed after that date. To the contrary, the trial record contains ample — indeed, undisputed — evidence that the MDCT was well-known at the time of the filing of the original 1988 application, and hence *before* April 1989. (2/13/07 Tr. 101:1-24, 131:24-132:3; DX 5004 at 5:49-54 (referring to the "well known" MDCT described in a 1986 paper))

The trial record also fully supports a finding that the method of claim 2 — including its use of an MDCT as the transform — constitutes "Existing Technology" rather than "New Work" under the JDA. Dr. Jayant, for example, identified specific portions of the original 1988 application that describe a time-to-frequency transform, of which an MDCT is one variety. (2/13/07 Tr. at 99:24-101:24) Because the MDCT was well known in the art when the original 1988 application was filed, a reasonable jury would be entitled to conclude — as Jayant opined — that the specification of the original 1988 application discloses the use of an MDCT to a person of ordinary skill in the art.[6] (*Id.*

---

[6] For the same reason, Microsoft's written description argument concerning the MDCT fails. *See Lampi*, 228 F.3d at 1378 ("In order to satisfy the written description requirement, the disclosure as originally filed need not provide *in haec verba* support for the claimed subject matter at issue.").

1    at 101:12-24)   And because the JDA expressly identifies the teachings of the original 1988

2    application as "Existing Work" (DX 6489 at 2, 8), a reasonable jury could also conclude that the

3    method of claim 2 was work performed before April 1989.

4        Microsoft contends that Mr. Johnston "learned about MDCT and its use from Dr.

5    Brandenburg . . . *after* the initiation of the JDA." (Microsoft Br. at 13)   But Johnston actually testified

6    that he knew about and had "looked at" the MDCT *before* Brandenburg came to AT&T.  (2/5/07 Tr.

7    at 36:13-16 ("I hadn't heard of [an MDCT] until I saw Karlheinz's paper, and then I had sort of

8    looked at it *before Karlheinz came* . . .") (emphasis added))   In any case, the jury was free to

9    disregard Johnston's testimony, particularly in light of the passage of time and the specter of bias

10   arising from his employment by Microsoft.  (2/14/07 Tr. at 200:21-22 ("You may believe everything

11   a witness says or a part of it or none of it."))   Johnston's testimony therefore provides no support for

12   Microsoft's JMOL motion.  *Pavao*, 307 F.3d at 918 (stating that on motion for JMOL, "the court . . .

13   must disregard evidence favorable to the moving party that the jury is not required to believe").[7]

14       In sum, Microsoft failed to prove that any claim of the '938 patent incorporates work first

15   performed in or after April 1989.  Microsoft's motion for JMOL on its license and standing defenses

16   concerning the '080 patent should be denied.

17       **C.    Even If A Subset Of The '938 Patent Claims Embody "New Work," Amendment
             Of This Court's March 19, 2007 Findings Would Not Be Warranted.**

18

19       Microsoft's request that the Court amend its March 19, 2007 findings under Rule 52(b) should

20   be denied even if this Court concludes — erroneously — that one or more of the claims of the '938

21   patent embody "New Work."   Such a finding would not, as Microsoft contends, compel the

22

23   _____

24   [7] Moreover, the jury knew that the "New Work" question bore on Microsoft's contention that
     Fraunhofer co-owns the '080 patent.  (2/5/07 Tr. at 220:12-223:5)  The jury was also aware that
25   Fraunhofer is not a party to this case, and saw no evidence that Fraunhofer *ever* claimed to be a
     co-owner of the '938 and/or '080 patents, despite knowing that Lucent has been asserting those
26   patents against users of MP3 technology for years.  (2/6/07 Tr. at 128:7-131:15)  Microsoft
     conspicuously failed to fulfill its promise to the jury that it would call a Fraunhofer witness, Mr.
27   Schubert, to testify on such matters.  (1/29/07 Tr. at 148:13-144:4)  The jury was entitled to draw
     reasonable inferences from those facts, which plainly support the jury's verdict that the claims of
28   the '938 patent incorporate no work first performed in or after April 1989.

1    conclusion that Microsoft is licensed to practice the claims of the '080 patent, or that Lucent lacks

2    standing to pursue this action.  This Court's March 19, 2007 findings that Lucent exclusively owns

3    the '080 patent and has standing to sue for infringement should therefore stand.

4         The JDA between AT&T and Fraunhofer dictates that "***intellectual property rights*** to ["New

5    Work"] will be jointly owned by AT&T and FhG," while intellectual property rights to "Existing

6    Technology" will not.  (DX 6489 at 3 (emphasis added))  Claims define the intellectual property

7    rights conferred by a patent.  *Hoechst-Roussel Pharms., Inc. v. Lehman*, 109 F.3d 756, 759 (Fed. Cir.

8    1997) ("[T]he claims define the patent owner's property rights . . . .");  *Phillips v. AWH Corp.*, 415

9    F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a bedrock principle of patent law that the claims of a patent

10   define the invention to which the patentee is entitled the right to exclude.").  Thus, by its plain terms

11   the JDA provides for co-ownership of some of a single patent's claims — *i.e.*, those that confer rights

12   in "New Work" — but not others.

13        The Supreme Court, however, has refused to recognize contractual agreements that purport to

14   segregate ownership rights in the same patent on a claim-by-claim basis.  *Pope Mfg. Co. v. Gormully*

15   *& Jeffery Mfg. Co.*, 144 U.S. 248, 252 (1982).  Such agreements are instead interpreted as license

16   grants under the pertinent patent claims.  *Id.*  ("We think the so-called assignment to [plaintiff] was a

17   mere license, and did not vest in him or his assigns the legal title to the second claim, nor the right to

18   sue in his own name upon it.").  Accordingly, where only a subset of a patent's claims constitute

19   "New Work," any "ownership" rights flowing to Fraunhofer under the JDA extend no further than a

20   license to practice and offer non-exclusive sublicenses under those particular claims.[8]

21        As a result, even if this Court grants JMOL that one or more of the '080 patent claims are

22   "New Work," Fraunhofer is not a co-owner of the '080 patent — and Microsoft's motion for JMOL

23   based on lack of standing fails — unless all of the '080 patent claims are "New Work."  Moreover,

24   because Fraunhofer cannot provide Microsoft a license to claims that do not constitute "New Work,"

---

[8] Consistent with that conclusion, an August 3, 1989 letter agreement that Microsoft concedes governs rights in "New Work" states that "***licenses*** to patents or technology will arise without any overt action by either party to the subject agreement."  (DX 6356 (emphasis added))

1    Microsoft's motion for JMOL based on its license defense must fail even if this Court erroneously

2    concludes that a subset of the '080 patent claims constituted "New Work."

3        **D.    The Jury's Damages Verdict Is Supported By Substantial Evidence And Is
              Otherwise Proper.**

4

5        In moving for JMOL to set aside the jury's damages award, Microsoft raises the same

6    arguments that it makes in support of its motion for a new trial on damages. Indeed, given that

     35 U.S.C. § 284 mandates "damages adequate to compensate for the infringement, but in no event
7
     less than a reasonable royalty," Microsoft's putative request for JMOL on this issue appears
8
     misplaced.    In any event, as Lucent demonstrates in Sections III.D - III.G of its opposition to
9
     Microsoft's motion for new trial, the record refutes Microsoft's assertions that the jury's award is
10
     excessive in view of the commercial benefit of the accused features, the alleged applicability of
11
     Microsoft's software license agreements, or Microsoft's complaints regarding the appropriate royalty
12
     base.  To the contrary, as also demonstrated in Lucent's opposition to Microsoft's motion for new
13
     trial, the record contains more than substantial evidence supporting the full amount of the jury's
14
     damages award.  Accordingly, this Court should deny Microsoft's motion for JMOL.
15

16       **E.    The Jury's Damages Verdict Is Wholly Consistent With The Evidence Presented
              By Lucent At Trial And Is Not Facially Inconsistent.**

17       As discussed more fully in Lucent's opposition to Microsoft's motion for a new trial, the

18   jury's verdict is not facially inconsistent — rather, it is fully consistent with the evidence and

19   argument presented by Lucent at trial. As Microsoft acknowledges, the verdict clearly shows the

20   intent of the jury to adopt Lucent's damages theories in full. As discussed in Lucent's opposition to

21   Microsoft's motion for a new trial, the jury's verdict clearly reveals on its face that the jury reached

22   its verdict on the basis of $5.64 per infringing unit — the unit rate equivalent to a 0.5% running

23   royalty on the base of a computer system. As also discussed in Lucent's opposition, there was

24   substantial evidence presented by Lucent at trial to support the jury's findings. Because a reasonable

25   jury could have reached a verdict of $5.64 per infringing unit based on the evidence presented at trial,

26   the Court should deny Microsoft's motion for judgment as a matter of law.

27

28

**F.  The *AT&T* Decision Does Not Render The Jury's Verdict Incorrect, And Does Not Operate To Set Aside The Verdict.**

The recent decision in *Microsoft Corp. v. AT&T Corp.*, 127 S. Ct. 1746 (2007), does not establish that the jury's verdict is incorrect as a matter of law and does not require that the entire verdict be set aside.  As an initial matter, and as further discussed in Lucent's opposition to Microsoft's motion for a new trial, the *AT&T* decision has no effect on Lucent's entitlement to damages for Microsoft's infringing sales in the United States.  Because the portion of the jury's verdict due to Microsoft's infringing domestic sales is supported by substantial evidence and the jury applied the correct legal standard in reaching its verdict, the Court at the very least should affirm that portion of the jury's verdict and deny Microsoft's motion for judgment as a matter of law as to Microsoft's infringement and corresponding damages in the United States.  Thus, at least $785,088,000 in damages has absolutely no connection to any issue addressed in *AT&T*.

Nor does *AT&T* prevent recovery under 35 U.S.C. § 271(f) of export sales damages based on Lucent's ***method*** claims.  Although Microsoft asserts that the *AT&T* held that "§ 271(f) does not entitle patentees, such as Lucent, to recover damages on uses of Microsoft products outside of the United States," (Microsoft Br. at 21), the Supreme Court's holding is not nearly so broad.  Rather, the holding of the case is limited to ***apparatus claims*** — the only type of claims at issue in that case.  Contrary to Microsoft's characterization, the Supreme Court expressly declined to address whether software can be a component of a method claim for the purposes of § 271(f):

> We need not address whether software in the abstract, or any other intangible, can ever be a component under § 271(f).  If an intangible method or process, for instances, qualifies as a "patented invention" under § 271(f) (a question as to which we express no opinion), the combinable components of that invention might be intangible as well.  The invention before us, however, AT&T's speech-processing computer, is a tangible thing.

*Microsoft v. AT&T*, 127 S. Ct. 1746, 1756 n.13 (2007).

In expressly declining to address that question, the Supreme Court left intact controlling Federal Circuit case law applying § 271(f) to method claims such as those asserted in this case, and that controlling law is clear:  § 271 applies to method claims, and software can constitute a "component" under § 271(f).  *See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 425 F.3d 1366 (Fed. Cir. 2005).  Both of those decisions remain controlling legal authority,

undisturbed by the *AT&T* decision. Thus, as the Federal Circuit held in *Eolas*, "a 'component' of a process invention would encompass method steps or acts." *Eolas*, 399 F.3d at 1339, 1340; *see also Union Carbide*, 425 F.3d at 1378-79. Further, the Federal Circuit recognized that software itself:

> in effect drives the "functional nucleus of the finished computer product." Without this aspect of the patented invention, the invention would not work at all and thus would not even qualify as new and "useful." Thus, the software code on the golden master disk is not only a component, it is probably the key part of this patented invention.

*Eolas*, 399 F.3d at 1339 (internal quotations omitted). On that basis, the Court concluded that software code is a "component" of a method claim under § 271(f):

> In sum, the language and history of section 271(f)(1) as well as this court's law protecting software inventions support this court's holding that section 271(f)(1)'s "components" include software code on golden master disks.

*Id.* at 1341; *Union Carbide*, 425 F.3d at 1379.

At trial, Lucent proved Microsoft's infringement of the method claims of both the '080 and '457 patents with respect to all sales of Windows Media Player 10 and 11, and the jury accordingly found Microsoft liable for infringement of multiple method claims under § 271(f). Consistent with controlling legal authority, a readily discernable amount of the damages based on Microsoft's export sales are unquestionably supported by the jury's method-claim infringement finding. Based on the stipulated sales figures, Microsoft sold 62.2 million export units of the infringing Windows Media Player version 10. (PX 3130)[9] Applying the jury's per-unit royalty of $5.64 per infringing unit, $350,808,000 of the damages attributable to Microsoft's export sales remain fully supported by substantial evidence and controlling case law, and cannot be set aside.[10]

---

[9] Although the jury also found infringement of WMP 11, the parties only presented sales data through November 2005 — before WMP 11 was introduced. Accordingly additional damages resulting from WMP 11's infringement of Lucent's method claims — both domestic and export — must be determined through an accounting, as Lucent has already requested.

[10] Lucent's claims for infringement under 35 U.S.C. § 271(f) do not require a showing of actual infringement abroad. *See Waymark Corp. v. Porta Sys. Corp.*, 245 F.3d 1364, 1368 (Fed. Cir. 2001). Therefore, Lucent was not required to show actual practice of the accused method claims abroad to be entitled to damages for each computer system capable of practicing the claimed method.

### G.    Substantial Evidence Supports The Jury's Verdict Of Nonobviousness.

Microsoft's motion for JMOL that the '080 patent is invalid for obviousness fails as a matter of law.  As set forth more fully in Section III.A.3 of Lucent's Opposition To Microsoft's Motion For A New Trial, substantial evidence supports the verdict of nonobviousness of that patent.  At trial, both parties focused on whether it would have been obvious to use an absolute hearing threshold with a masking threshold to determine quantization step sizes in conjunction with a rate loop processor as required by claims 1 and 4.  Lucent's expert, Dr. Jayant, expressly applied the *Graham* analysis — the very analysis reaffirmed by the Supreme Court in *KSR* — in opining that the claimed invention would not have been obvious to a person of skill in the art in the relevant 1986-88 time frame. (2/13/07 Tr. at 88:8-91:4)  Jayant noted that which references to the absolute hearing threshold appeared in psychoacoustic literature, the absolute hearing threshold had not been used in audio coders at that time. (2/13/07 Tr. at 89:7-90:18)  Jayant opined that it would not have been obvious to a person of skill in the art to use an absolute hearing threshold in an audio coder, let alone in the specific arrangement contemplated by the claims of the '080 patent. (2/13/07 Tr. at 90:7-18)  In his view, Microsoft's contrary assertions were based on nothing more than hindsight. (2/13/07 Tr. at 87:12-88:4)

The jury also heard evidence that persons of *extraordinary* skill in the art at the relevant time — Drs. Brandenburg and Schroeder — had not used absolute hearing thresholds in their coding work. (2/6/07 Tr. at 92:7-24, 182:7-22, 184:3-13; 2/12/07 Tr. at 11:4-7)  Indeed, the jury learned that no existing audio coder employed an absolute hearing threshold — not Brandenburg's OCF coder, nor Schroeder's MSC coder, nor Krahe's ATC coder. (2/12/07 Tr. at 10:11-12:10)  Thus, the evidence refutes Microsoft's assertion that an absolute hearing threshold was an "old element . . . performing the same function." (Microsoft Br. at 22)  Brandenburg also admitted that one skilled in the art in the relevant time frame would not have believed that an absolute hearing threshold would be useful in an audio coder. (2/16/07 Tr. at 183:1-8, 184:1-13)  Finally, the jury had the benefit of Brandenburg's own patent application filed in February 1994 — six years *after* the effective filing date of the '080 patent — that expressly identified the use of an absolute hearing threshold as a "considerable advance" in the art that had occurred in "the last few years." (2/6/07 Tr. at 186:2-188:11; PX 3173 at

1   1:24-32)  Based on this record, a jury would reasonably be entitled to conclude that the claimed

2   inventions of the '080 patent were nonobvious.

3       **H.    The Jury Reasonably Found That Microsoft Failed To Prove That Claim 4 Of
            The '080 Patent Is Invalid Over The 1987 OCF Paper.**

4           Microsoft's motion for JMOL that the 1987 OCF paper invalidates claim 4 of the '080 patent

5   lacks merit both because Microsoft failed to meet its clear-and-convincing burden of proof on that

6   issue and because the trial record contains ample evidence to rebut any scintilla of invalidity proof

7   that Microsoft presented.    Microsoft's entire JMOL argument hinges on the testimony of Dr.

8   Brandenburg.  (Microsoft Br. at 23)  But rather than performing a meaningful invalidity analysis,

9   Brandenburg summarily declared that the 1987 OCF paper and/or another reference — the '060

10  patent — discloses each element of claim 4.  (2/6/07 Tr. at 88:16-94:10)  He identified no specific

11  portion of the 1987 OCF paper that discloses any of the elements of claim 4.  (*Id.*)  Nor did he even

12  mention the corresponding structure for the means-plus-function elements.    (*Id.*)    As such,

13  Brandenburg's testimony is insufficient to support — let alone dictate — a finding of invalidity.[11]

14  *Kotio Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) ("General and

15  conclusory testimony . . . does not suffice as substantial evidence of invalidity.").

16          Lucent, on the other hand, offered ample proof to rebut any suggestion that the 1987 OCF

17  paper anticipates or renders obvious claim 4.    Undisputed evidence establishes that claim 4

18  incorporates each step of claim 1.  (1/30/07 Tr. at 185:24-186:15; 2/8/07 Tr. at 220:22-221:18; PX 3

19  at 24:44-58, 24:66-26:9)  Dr. Jayant explained in detail that both the 1987 OCF paper and the '060

20  patent fail to disclose at least elements (C) and (D) of claim 1, which are identical to elements (a)(3)

21  and (a)(4) of claim 4.  (2/13/07 Tr. at 79:21-82:18, 86:14-87:6; PX 3 at 24:44-58, 24:66-26:9)

22  Accordingly, Lucent introduced ample evidence to rebut Microsoft's flimsy anticipation case.

23          Likewise, Lucent introduced proof to rebut any assertion of obviousness that can be extracted

24  from Brandenburg's nebulous testimony.  While Dr. Brandenburg opined that "it would have been

25

26  _____

27  [11] Indeed, Dr. Brandenburg never actually testified that the 1987 OCF paper anticipates or renders
        obvious claim 4.

28

1   obvious for someone to define absolute hearing threshold in another reference and combine it with

2   the Brandenburg materials" (2/6/07 Tr. at 93:8-10), Jayant systematically controverted that

3   testimony. (2/13/07 Tr. at 87:12-91:4)   On this record, Microsoft cannot demonstrate that no

4   reasonable jury could find Microsoft failed to prove claim 4 of the '080 patent invalid by clear and

5   convincing evidence.   Microsoft's motion for JMOL should therefore be denied.

6   **I.   The Jury Reasonably Found That Microsoft Failed To Prove That The Low Bit
    Rate Paper Anticipates The Asserted Claims Of The '080 Patent.**

7   Microsoft's motion for JMOL that Brandenburg's November 1988 Low Bit Rate paper

8   anticipates the claims of the '080 patent fails on several grounds.   As an initial matter, Microsoft

9   offered no proof that the Low Bit Rate Paper anticipates claims 1 and 3 of the '080 patent.   Rather,

10   Dr. Strawn — the only Microsoft witness who addressed the Low Bit Rate paper — limited his

11   testimony to claim 4.   (2/7/07 Tr. at 198:19-205:4)   Moreover, because Strawn's testimony

12   concerning claim 4 and the Low Bit Rate paper was every bit as conclusory as Brandenburg's

13   testimony concerning claim 4 and the 1987 OCF paper, the jury could reasonably have concluded

14   that Microsoft failed to prove that the Low Bit Rate paper anticipates claim 4.   *Kotio*, 381 F.3d at

15   1152 ("General and conclusory testimony . . . does not suffice as substantial evidence of invalidity.").

16   In any event, Lucent presented ample proof that the Low Bit Rate paper fails to qualify as

17   prior art because inventions of the '080 patent were reduced to practice long before November 1988.

18   For example, the inventor of the '080 patent, Mr. Johnston, testified at length that (1) he had

19   developed a working embodiment of a codec he called "PXFM" by January 1987, and (2) the PXFM

20   codec embodied all of the functionality of the '080 patent inventions.   (2/5/07 Tr. at 6:15-9:19, 96:3-

21   99:25, 103:2-105:6)   Contemporaneous documents, including an April 1987 technical memorandum

22   witnessed by Dr. Jayant and a February 1988 peer-reviewed journal article confirm Johnston's

23   testimony.   (PX 128; PX 129)   Those documents describe the PXFM codec, verify that it practiced

24   the '080 patent inventions, and provide test results confirming that Johnston implemented a working

25   codec no later than April 1987.   (2/5/07 Tr. at 6:15-9:19, 96:3-99:25, 103:2-105:6)   Such evidence

26

27

28

1   fully supports the jury's implicit determination that the inventions of the '080 patent were reduced to

2   practice before November 1988, the alleged publication date of the Low Bit Rate Paper.[12]

3       Microsoft does not challenge the substance or veracity of Johnston's testimony, but rather

4   argues that his testimony is technically deficient without independent corroboration. Binding Federal

5   Circuit authority holds otherwise. Where, as here, an inventor is not a party to the litigation and is

6   not seeking to establish priority of his patent for his own benefit, his testimony concerning reduction

7   to practice does not require corroboration:

> The cases that discuss skepticism of uncorroborated inventor testimony directed to
> establishing priority over an opponent's patent claim involve situations where the
> inventor is self-interested in the outcome of the trial and is thereby tempted to
> "remember" facts favorable to his or her case. ... Thus, the corroboration rule is
> needed only to counterbalance the self-interest of a testifying inventor against the
> patentee. *We therefore hold that corroboration is required only when the testifying
> inventor is asserting a claim of derivation or priority of his or her invention and is a
> named party, an employee of or assignor to a named party, or otherwise is in a
> position where he or she stands to directly and substantially gain by his or her
> invention being found to have priority over the patent claims at issue.*

14   *Thomson, S.A. v. Quixote Corp.*, 166 F.3d 1172, 1176 (Fed. Cir. 1999) (emphasis added). At trial,

15   Johnston was not a party asserting a claim of derivation or priority of his invention. Nor did he stand

16   to gain from establishing an early priority date. To the contrary, as a Microsoft employee, his interest

17   resided in establishing the latest invention date possible.

18       In any event, ample independent evidence corroborates Johnston's testimony concerning

19   reduction to practice. Jayant, who supervised Johnston's work leading to the '457 and '080 patents

20   (1/30/07 Tr. at 66:25-67:13), and signed Johnston's April 1987 technical memorandum describing the

21   PXFM coder[13] (PX 128), testified *from his own personal experience* that invention was completed

---

[12] Microsoft bore the burden at trial of proving by clear and convincing evidence that the Low Bit
Rate paper was published before Johnston's invention date. *Marhurkar v. C.R. Bard, Inc.*, 79
F.3d 1572, 1578 (Fed. Cir. 1996).

[13] The fact that Jayant signed the April 1987 technical memorandum renders inapposite
Microsoft's attempt to compare that memorandum with an unwitnessed inventor notebook.
(Microsoft Br. at 24) Moreover, Microsoft simply ignores Johnston's February 1988 peer-
reviewed journal article. (PX 129) Together, those documents not only corroborate Johnston's
testimony, but also independently demonstrate reduction to practice before November 1988.

by January 1987.[14]   (2/13/07 Tr. at 91:20-92:4, 137:23-138:20; 139:23-142:24)   Accordingly, Microsoft's motion for JMOL fails even under Microsoft's erroneous view of the law.

### J.   Lucent Presented Substantial Evidence From Which The Jury Could Reasonably Conclude That The Accused Products Infringe The Johnston '080 Patent.

At trial, Dr. Jayant, explained how the Windows Media Player Fast encoder meets each and every limitation of asserted claims 1, 3, and 4 of the '080 patent.   (1/30/07 Tr. at 134:21-160:18, 182:24-192:19)   In a single sentence, Microsoft challenges the jury's infringement verdict, arguing that the pbThresholdQuiet curve of the Fast encoder is not an absolute hearing threshold because it "deviates greatly from the scientifically accepted estimate of the 'quietest sounds the human ear can hear.'"   (Microsoft Br. at 24:13-16)   But Microsoft simply ignores Jayant's testimony, and instead cites its own expert's testimony and a series of demonstrative exhibits that were never received in evidence.   (Id.)   Jayant explained that the pbThresholdQuiet curve is an absolute hearing threshold within the Court's claim construction by comparing it to two known estimates of the threshold.   (1/30/07 Tr. at 149:3-152:20, PTX 1503)   Moreover, although Microsoft's own expert, Dr. Strawn attempted to dispute this point at trial, the jury learned that Strawn previously conceded that that the pbThresholdQuiet curve is an absolute hearing threshold within the Court's claim construction.   (2/8/07 Tr. at 101:7-10, 2:20)   The jury was entitled to accept Lucent's evidence over Microsoft's.

Microsoft also argues that it was prejudiced by the Court's refusal to allow Microsoft to reference another court's summary judgment order in an unrelated case involving Dolby Laboratories.   Putting aside the fact that a collateral order regarding a different product and different evidence is irrelevant to the infringement issue here, Microsoft itself never asked to present this order in furtherance of its infringement case.   Instead, Microsoft merely sought to introduce the Dolby order as part of its defense to willful infringement, an issue on which Microsoft ultimately prevailed.   (1/3/07 Tr. at 118:9-18, 121:25-122:14, 125:10-24)   Accordingly, Microsoft cannot now claim prejudice based on evidence that it never sought to introduce.

---

[14]   Mr. Johnston confirmed that he demonstrated a functional computer implementation of his invention to Dr. Jayant before November 1988.   (2/5/07 Tr. at 7:5-10, 9:2-16)

**K.    Lucent Presented Substantial Evidence From Which The Jury Could Reasonably Conclude That Microsoft Induced And Contributed To The Infringement Of The Patents-In-Suit Through The CyberLink Encoder.**

As with the HQ Encoder, Microsoft asserts that Lucent failed to prove indirect infringement by the CyberLink Encoder. Lucent addresses the contributory-infringement argument in Section III.J of Lucent's Opposition to Microsoft's Motion for New Trial. As for induced infringement, Lucent offered substantial evidence that Microsoft encouraged the use of the CyberLink encoder and "knew or should have known" that its acts would cause direct infringement by customers of the CyberLink encoder. (*Supra*, Section III.A.5)

While Microsoft argues that Lucent only proved that a Microsoft website includes a link to CyberLink's website, Lucent in fact offered extensive evidence that Microsoft encourages the use of CyberLink MP3 encoders. That evidence included press releases regarding the CyberLink encoder and a link from Windows Media Player itself that a customer can use to purchase the CyberLink encoder. (1/30/07 Tr. at 249:8-251:9; 2/1/07 Tr. at 26:1-27:12, 108:21-109:24; PX 16; PX 18; PX 23; PX 79; PX 1512) Moreover, Microsoft's argument that it did not know how the CyberLink encoder functioned is simply untrue, as Lucent presented testimony that Microsoft tested the accused CyberLink encoders. (2/12/07 Tr. at 27:1-23) Thus, the jury was entitled to conclude that Microsoft knew or should have known that its acts would cause customers to infringe the '457 and '080 patents. *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304 (Fed. Cir. 2006).

## IV.    CONCLUSION

For the foregoing reasons, Lucent respectfully requests that the Court deny Microsoft's motion for judgment as a matter of law.

1   DATED: June 1, 2007

BY:_____s/Alison P. Adema_____
John M. Desmarais (admitted *pro hac vice*)
Robert A. Appleby (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
Telephone: (212)446-4800
Facsimile: (212)446-4900

Alison P. Adema, SBN 149285
HAHN & ADEMA
501 West Broadway, Suite 1600
San Diego, California 92101-3595
Telephone: (619) 235-2100
Facsimile: (619) 235-2101

Attorneys for *Lucent Technologies Inc.*